[No. B003428. Second Dist., Div. Three. July 24, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
EUGENE CLARENCE HARTMAN, Defendant and Appellant.

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and James A. Uyeda, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert F. Katz and William V. Ballough, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ARABIAN, J.—**

### INTRODUCTION

Defendant and appellant Eugene Clarence Hartman (appellant) was charged by information with the murder of John Langlos, whose death had occurred seven years earlier. After trial by jury, appellant was convicted of second degree murder (Pen. Code, § 187). Appellant's motion to dismiss for lack of due process due to the delay in charging him with murder (Cal. Const., art. I, § 15) and his motion for new trial (Pen. Code, § 1181) were denied. Appellant was sentenced to state prison for the term prescribed by law minus good time/work time credit. He appealed from the judgment of conviction. We reverse.

### STATEMENT OF FACTS

On the morning of Saturday, January 31, 1976, psychologist John Langlos went to his office at the Lakewood Park Psychiatric Health Center. That evening he failed to appear at a musical performance he was scheduled to give. On Monday morning, February 2, 1976, an employee of the psychiatric clinic discovered Langlos' body under his desk; he was dead.

The police criminologist who arrived on the scene, one-half hour after the body was found, initially observed that nothing was noticeably out of place in the office. However, upon further inspection he found that the desk

had been shifted and the carpeting in front of it was "bunched up." A wall calendar lying on the floor had drops of blood on it. There were blood splotches containing hair impressions on the wall above the desk chair, and blood drippings were present on the floor, the corner of the desk, and the back of the telephone receiver.

Langlos had a V-shaped laceration on the top of his head and the inside of his lips were bruised. The top three buttons had been torn from his shirt; his necktie was missing and the rear pocket of his pants was turned inside out. Langlos' empty money clip was discovered in a briefcase in the office, and his wallet, which had contained credit cards, blank checks, and his driver's license, was missing.

On Sunday, February 1, 1976, the day before Langlos' body was discovered, appellant, a psychologist who worked for Langlos, cashed a forged $100 check drawn on Langlos' account using Langlos' driver's license and credit cards for identification. On that date, appellant also used Langlos' Mastercharge to purchase a watch and airline tickets.

On February 3, 1976, an autopsy was performed on Langlos' body by a deputy coroner, Dr. Eugene Carpenter. Before the autopsy, a police officer described to Dr. Carpenter the condition of Langlos' office when the body was found and told him the death was being investigated as a possible robbery-homicide. Dr. Carpenter was unable to determine the exact cause of death, but he ruled out the laceration on Langlos' head as the cause, because there was no sign of hemorrhage or skull fracture.[1] After finding evidence that Langlos' coronary artery was 70 percent occluded, he concluded the cause of death was natural, not homicidal, and stemmed from occlusive heart disease, a type of heart attack. Dr. Carpenter commented at the autopsy that it was his practice generally to relate a death to the heart when he could not determine a specific cause.

The police department presented the case to the district attorney's office and attempted to have a murder charge filed against appellant. The filing deputy district attorney spent several hours with a police investigator, and was aware of both the police reports and the coroner's report. The filing

---

[1]Los Angeles Deputy Coroner Jesus Aguilar, who investigated the laceration on the victim's head at the time of death, stated the V-shaped cut matched an impression he made of the corner of Langlos' desk. He thought the most likely explanation for the laceration at the angle it appeared on the victim's head was that the head had been pulled down onto the desk, although he acknowledged that other objects or means could have resulted in the wound.

Pathologist Dr. Ronald Kornblum stated he believed it was highly unlikely that forcing a person's head down onto a desk would result in a laceration on top of the head, instead of on the forehead or face.

deputy, exercising a quasi-judicial judgment, decided not to pursue the homicide, and on February 18, 1976, filed an information against appellant, which charged him with one count of forgery (Pen. Code, § 470), two counts of forgery of credit cards (Pen. Code, § 484f, subd. (2)), one count of grand theft person (Pen. Code, § 487, subd. 2), and one count of grand theft (Pen. Code, § 487, subd. 1) in connection with the Langlos matter.

On April 6, 1976, calendar Deputy District Attorney Robert Corrado accepted appellant's guilty plea to one count of forgery. Before the plea was taken, Mrs. Ruth Langlos, the victim's widow, had repeatedly expressed to Mr. Corrado, by phone and in person, her belief that her husband's death was a homicide. However, Mr. Corrado also met with Dr. Carpenter and Dr. Thomas Noguchi, the Los Angeles County Coroner; they told Mr. Corrado that Langlos' death stemmed from "natural causes." Therefore, Mr. Corrado believed the case was not a "prosecutable homicide."

Following appellant's plea of guilty, on May 4, 1976, proceedings were suspended and he was placed on probation for five years on condition that he spend 34 days in county jail and pay a fine of $500. He was given credit for the 34 days he had already spent in jail.

Mr. Corrado reviewed the case file again on September 22, 1976, and drafted a memo in which he concluded there was "no criminal homicide."

Meanwhile, the victim's widow, Mrs. Langlos, who was "very dissatisfied" with the coroner's findings, and "furious" with the district attorney's office for not holding a coroner's inquest or charging appellant with homicide, hired an independent pathologist, Dr. Ervin Jindrich, the Marin County Coroner. The victim's body was exhumed and Dr. Jindrich performed a second autopsy, along with Dr. Carpenter, on January 20, 1977. Although the body was adequately preserved, several internal organs, including the brain, bladder, and kidney were "lost" after the initial autopsy. Dr. Jindrich concluded "to a reasonable medical certainty," based on the autopsy and the scene of death, that the victim died at the hands of another. Although he found the evidence too inconclusive a year after the death to determine its *cause,* he believed the most likely explanation was strangulation, or possibly smothering or cardiac arrhythmia (erratic heartbeat).

Dr. Jindrich believed that Dr. Carpenter's theory of the cause of death, cardiac occlusion, was unlikely because the reautopsy showed only a 50 percent occlusion of the coronary artery, which Dr. Jindrich stated was normal for a man of Langlos' age. After the second autopsy, Dr. Jindrich conferred with Dr. Noguchi and Dr. Dean Wisely, who was Dr. Carpenter's

immediate supervisor. Drs. Noguchi and Wisely continued to support Dr. Carpenter's finding.

In October of 1977, Mrs. Langlos contacted Dr. Ronald Kornblum, the Ventura County Coroner, for his review of the case. Dr. Kornblum also concluded that Langlos' death stemmed from a homicide, but he too could not determine the cause. He theorized the most likely explanation for the cause of death was ventricular fibrillation during the course of a struggle.[2] Contrary to the opinion of Dr. Jindrich, he thought strangulation was not a likely cause of death.

Mrs. Langlos also contacted Dr. Margaret Billingham, a well-known cardiac pathologist, who reviewed heart tissue slides taken during one of the autopsies. She was unable to examine the heart itself, because it too was "lost" after the second autopsy. Dr. Billingham concluded that the victim's heart was only 50 percent occluded. Contrary to the opinion of Dr. Kornblum, she believed the evidence of possible fibrillation was inconclusive, especially as she found no evidence of prior heart disease.

Armed with the new but conflicting expert interpretations of her husband's death, which she had collected by the end of 1977, Mrs. Langlos attempted to obtain authority to reopen the case. In April of 1978, she tried unsuccessfully to obtain a writ of mandate to compel the coroner's office to alter the stated cause of death. For the next several years she was "constantly" contacting the district attorney's office, coroner's office, and various divisions of the police department. The district attorney consistently refused to order a coroner's inquest. By May of 1982, Mrs. Langlos was finally successful in urging the Attorney General's office to conduct a formal inquest, at which testimony from both Dr. Carpenter and Mrs. Langlos' expert pathologists was introduced. The coroner's jury determined that Langlos' death was at the hands of another.

In June of 1982, Mrs. Langlos asked the Los Angeles County Board of Supervisors to submit a resolution requesting the district attorney to reopen the case; the board complied. In April of 1983, seven years after Langlos' death, six years after the second autopsy had been performed, and without the discovery of any new or additional evidence since then, the district attorney's office filed an information charging appellant with one count of murder.

---

[2]Ventricular fibrillation is a type of heart attack resulting from electrical impulses that cause fluttering and may result from undue stress. Because the condition is electrical, it does not show up during an autopsy.

Appellant made motions to dismiss before trial for "invidious prosecution" and for improper multiple prosecutions pursuant to *Kellett* v. *Superior Court* (1966) 63 Cal.2d 822 [48 Cal.Rptr. 366, 409 P.2d 206]. The motions were denied. Following trial by jury, appellant was found guilty of second degree murder.[3]

Both his motion to dismiss on due process grounds, which by stipulation was reserved until the end of trial,[4] and his motion for new trial were denied. Appellant was sentenced to state prison for the term prescribed by law. He appealed.

### CONTENTIONS

Appellant contends:

1. His due process rights were violated by the seven-year delay between Langlos' death and the filing of the murder charge.

2. His murder charge was barred by the prohibition against multiple prosecutions set forth in *Kellett* v. *Superior Court, supra,* 63 Cal.2d 822.

3. The prosecution failed to introduce sufficient evidence to show implied malice.

4. The jury instructions on implied malice were erroneous.

5. The trial court committed prejudicial error by refusing to instruct the jury on involuntary manslaughter.

### DISCUSSION

"Delay of justice is injustice."[5]

Appellant's first contention, that his due process rights were violated by the seven-year delay between Langlos' death and the filing of the murder charge, is meritorious.

---

[3]Appellant decided at the last minute that he would not take the stand because his testimony would have contradicted his statements made in 1977 before the California Psychological Examining Committee. He then would have been subjected to a perjury charge, for which a grant of immunity was denied.

[4]"It is proper for the trial court to wait to appraise the reasonableness of the delay in light of what would be disclosed at and after the trial. . . ." (*People* v. *Archerd* (1970) 3 Cal.3d 615, 641 [91 Cal.Rptr. 397, 477 P.2d 421].)

[5]Landor, *Imaginary Conversations: Peter Leopold and President DuPaty.*

■ The California Supreme Court has held that "due process is the appropriate test to be applied to a delay occurring after a crime is committed but before a formal complaint is filed or the defendant is arrested." (*Scherling* v. *Superior Court* (1978) 22 Cal.3d 493, 505 [149 Cal.Rptr. 597, 585 P.2d 219]; *People* v. *Reeden* (1984) 152 Cal.App.3d 900, 909 [200 Cal.Rptr. 479].) " 'It is not improbable that under certain circumstances an accused may be deprived of due process of law, if the lapse of time between the alleged commission of the offense and the filing of the accusation makes it difficult or impossible for the accused to prepare his defense.' " (*People* v. *Archerd, supra,* 3 Cal.3d 615, 640, quoting *People* v. *Wilson* (1966) 239 Cal.App.2d 358, 365 [48 Cal.Rptr. 638].) Such due process rights may stem from the federal law or from article I, section 15 of the California Constitution. (*Garcia* v. *Superior Court* (1984) 163 Cal.App.3d 148, 151 [209 Cal.Rptr. 205].)

In determining whether a criminal defendant's due process right to a fair trial has been violated, we employ a three-step test. (*People* v. *Archerd, supra,* 3 Cal.3d at pp. 639-640.) The defendant has the initial burden of showing prejudice as a result of the delay; the prosecution then must show justification for the delay; thereafter, the court balances the harm against the justification. (*People* v. *Reeder, supra,* 152 Cal.App.3d at p. 909-910; *Ibarra* v. *Municipal Court* (1984) 162 Cal.App.3d 853, 858 [208 Cal.Rptr. 783].)

### *Prejudice resulting from the delay.*

■ The actual amount of time between the commission of the crime and the filing of charges is not the critical issue in determining prejudice. (*Fowler* v. *Superior Court* (1984) 162 Cal.App.3d 215, 221 [208 Cal.Rptr. 408].) Prejudice sufficient to sustain dismissal has resulted after a delay of five months (*People* v. *Cave* (1978) 81 Cal.App.3d 957 [147 Cal.Rptr. 371]), while charges filed after a delay of 10 years have been upheld (*Scherling* v. *Superior Court, supra,* 22 Cal.3d 493). A defendant must show *actual* prejudice based on the facts of the case. (*People* v. *Allen* (1979) 96 Cal.App.3d 268, 278-279 [158 Cal.Rptr. 54].)

The California Supreme Court stated in *People* v. *Archerd, supra,* 3 Cal.3d at page 640, that prejudice may be shown by "the loss of a material witness or other missing evidence or fading memory caused by lapse of time." The United States Supreme Court has also held that "[i]f witnesses die or disappear during a delay, the prejudice is obvious." (*Barker* v. *Wingo* (1972) 407 U.S. 514, 532 [33 L.Ed.2d 101, 118, 92 S.Ct. 2182].)

■ Here, both Dr. Carpenter and his supervisor, Dr. Wisely, died shortly before the murder charge was filed in 1983. As a result, Dr. Car-

penter was unable to explain his findings or conclusions at the trial, or to rebut the implications, raised by several witnesses, that he had been negligent. Likewise, Dr. Wisely could not testify why he supported Dr. Carpenter's determination that Langlos' death was due to natural causes.

Pathetically, the coroner's office "misplaced" the victim's brain after the initial autopsy. Thus, Dr. Jindrich, who performed the second examination on the body, was not able to examine the brain. He stated that its absence was "a matter of concern [since] there was an injury to the individual's head." A police investigator from the homicide division testified that a complete examination of the brain is a critical factor in determining whether the death was the result of a beating.

To make matters worse, the victim's heart was removed after the second autopsy and placed in formalin, but it also disappeared and could not be found even after a thorough search of the coroner's office. Several experts, from both the prosecution and defense, testified at trial that coronary fibrillation caused Langlos' death, and Dr. Carpenter had originally stated the victim died from coronary occlusion. Since the heart was unavailable at the time of the trial, it was impossible to resolve these medical inconsistencies.

Although the California Constitution "[does not] require police officers to act like pack rats, saving every scrap of paper generated in an investigation" (*In re Jessie L.* (1982) 131 Cal.App.3d 202, 211 [182 Cal.Rptr. 396]), internal organs relevant to determining the cause of death are certainly not in the same category as "every scrap of paper."

As if the above occurrences of missing evidence were not enough, by the time the murder trial was held, even the photographs taken at the second autopsy were missing. Dr. Noguchi stated that performing a third autopsy would be "highly unlikely to reveal anything new," because of the marked decomposition of the body after seven years.

Finally, appellant's counsel argued at the hearing that appellant could have introduced alibi witnesses for his whereabouts at the probable time of death, but the witnesses would be difficult to locate and would have trouble remembering the details of one Saturday seven years earlier. (See *Penney v. Superior Court* (1972) 28 Cal.App.3d 941, 951 [105 Cal.Rptr. 162]; *Ibarra v. Municipal Court, supra,* 162 Cal.App.3d 853, 858.)

Accordingly, we find in the first step of our analysis, that actual prejudice resulted from the prolonged delay in bringing appellant to trial.

*Justification for the delay.*

█ Next, in determining whether the People have shown a legitimate justification for the prolonged delay, "the particular circumstances surrounding the decision not to prosecute, the length of the delay, and the reasons for the subsequent re-evaluation and prosecution must all be considered." (*Penney* v. *Superior Court, supra,* 28 Cal.App.3d at p. 954.)

The need of law enforcement officials for additional time to conduct an investigation may constitute adequate justification, if the delay is reasonable and advances a valid police purpose. (*Jones* v. *Superior Court* (1970) 3 Cal.3d 734, 740-741 [91 Cal.Rptr. 578, 478 P.2d 10]; *People* v. *Cave, supra,* 81 Cal.App.3d 957, 963; *People* v. *Williams* (1973) 30 Cal.App.3d 502, 506-507 [106 Cal.Rptr. 324]; *People* v. *Bethea* (1971) 18 Cal.App.3d 930, 939 [96 Cal.Rptr. 229].)

However, "[n]egligence on the part of police officers in gathering evidence or in putting the case together for presentation to the district attorney, or incompetency on the part of the district attorney in evaluating a case for possible prosecution can hardly be considered a valid police purpose justifying a lengthy delay which results in the deprivation of a right to a fair trial." (*Penney* v. *Superior Court, supra,* 28 Cal.App.3d at p. 953.)

Further, the delay may be unreasonable if the prosecution delayed in filing charges when all the evidence was discovered years earlier. (See *Penney* v. *Superior Court, supra,* 28 Cal.App.3d at p. 947.) In *People* v. *Archerd, supra,* 3 Cal.3d 615, the California Supreme Court cited with approval an Illinois case in which a conviction was reversed because "the state had all the evidence on a murder charge it would ever have *in 1939,* but made a deliberate election to forego prosecution for [the] offense until 1953. . . ." (*Id.,* at p. 640 [citing *People* v. *Hryciuk* (1967) 36 Ill.2d 500 (224 N.E. 2d 250)], italics in original.)[6]

In *People* v. *Pellegrino* (1978) 86 Cal.App.3d 776 [150 Cal.Rptr. 486], the court upheld the trial court's dismissal of charges where "the reason for the delay was not investigative needs but the lack of interest of the responsible agencies in prosecuting the defendants on the basis of [the] evidence." (*Id.,* at p. 781.) In *Pellegrino,* the federal investigator submitted his report

---

[6]In *People* v. *Archerd, supra,* 3 Cal.3d 615, the court upheld charges filed 11 years after the commission of murder by insulin injection. In that case, insulin could not be scientifically proven as a criminal agency responsible for the death when the crime was committed in 1956. It was only after a "scientific breakthrough" occurred in 1967 that an adequate foundation for prosecution was formed. (*Id.,* at pp. 641-643.) Significantly, the charges were filed in the *same year* that the police learned of the new proofs and procedures.

on the defendant's criminal activities, but the U.S. Attorney's Office decided not to prosecute based on the lack of substantial evidence of any crime having been committed. The trial court determined that " '[t]he People cannot simply place gathered evidence of insubstantial crimes on the "back burner" hoping that it will some day simmer into something more prosecutable . . . .' " (*Id.,* at p. 781.)

■■■ Here, the prosecution did not charge appellant with murder in 1976 because it simply did not have sufficient medical testimony to constitute a prosecutable homicide.[7] By late 1977, however, Mrs. Langlos' efforts had secured the expert opinions and reports on which the subsequent inquest and murder trial were based. Her tenacious effort to have the district attorney's office or coroner's office reopen the case continued for five and half years, during which time her requests were repeatedly refused. Finally, as noted above, she prevailed upon the Attorney General's office and the Board of Supervisors, which intervened.

The People were unable to offer any satisfactory explanation whatsoever for this inordinate delay, either in their brief or at oral argument. They merely insist that the prosecution acted reasonably in accepting the original coroner's report, and that "it was not until *the appearance of Drs. Kornblum and Billingham upon the scene* that the prosecution had a sufficient number of credible expert witness[es] that a decision to proceed could be made." (Italics added.) While that may be true, it still fails to point to any valid reason for the *subsequent* delay of five and a half years in filing the murder charge.

Consequently, while there may have been some justification for delaying the filing of the murder charge until the prosecution could prove the homicide beyond a reasonable doubt, there was no reasonable justification for the district attorney's office to turn its back on the new evidence once it was available at the end of 1977.

*Balancing test.*

We then must balance the foregoing concerns. In *Ibarra* v. *Municipal Court, supra,* 162 Cal.App.3d at page 858, the court stated: "Even a minimal showing of prejudice may require dismissal if the proffered justification for delay be unsubstantial. By the same token, the more reasonable the

---

[7]Mr. Corrado, the deputy district attorney who accepted the appellant's plea of guilty to forgery, testified that the autopsy report stating the death resulted from natural causes was a major factor in his accepting a plea, and that he would not have done so if he had been aware the death was the result of a homicide.

delay, the more prejudice the defense would have to show to require dismissal. Therein lies the delicate task of *balancing* competing interests."

Here, we have determined that appellant sustained irreparable, actual and substantial prejudice by reason of the delay in charging him with the murder. We have also determined that the delay by the prosecution, from the time the new expert testimony became available, was without any justification whatever. Accordingly, we have no choice but to conclude that because of the prolonged delay in filing the murder charge against him, appellant's due process rights were violated. Further, we find this violation resulted in a miscarriage of justice under the California Constitution, article VI, section 13.

Since reversal is required on due process grounds we need not address appellant's other contentions on appeal. However, we note that reversal is also required by our Supreme Court's decision in *Kellett* v. *Superior Court, supra,* 63 Cal.2d 822, which interprets Penal Code section 654 to prohibit prosecution under the circumstances of this case.[8]

## CONCLUSION

We long ago learned, from our Anglo-Saxon jurisprudential history, that the crown does not win or lose a case, it merely sees that justice is done.

The primary function of the office of prosecutor is to diligently and vigilantly pursue those who are believed to have violated the criminal codes of the state.

In that regard, the guiding light of due process illuminates the field of combat and defines the depth of the duty to be obeyed.

While hard blows may be struck against an opponent, the strike may not be withheld without warrant until such time as occasions an adversarial disability.

The combination of circumstances chronicled here violated fundamental fairness, the touchstone of due process.

---

[8]In *Kellett* v. *Superior Court, supra,* 63 Cal.2d 822, Chief Justice Traynor declared: "When, as here, the prosecution *is or should be aware* of more than one offense in which the same act or course of conduct plays a significant part, all such offenses must be presented in a single proceeding unless joinder is prohibited or severance permitted for good cause. Failure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the initial proceedings culminate in either acquittal or conviction and sentence." (*Id.,* at p. 827; italics added [footnote omitted].)

## Disposition

The judgment is reversed.

Klein, P. J., and Danielson, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 28, 1985.