[No. F022116. Fifth Dist. June 27, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
DIANE LORRAINE DUNN-GONZALEZ, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

\*It is ordered that the introductory text summarizing the case background, "Facts From the Hearing on Motion to Dismiss," part I of the Discussion, and the dispositional paragraph of the opinion are certified for publication.

## COUNSEL

Cleary & Sevilla and Charles M. Sevilla for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Edgar A. Kerry and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MARTIN, Acting P. J.**—On February 15, 1994, the Kern County District Attorney filed an information charging defendant as follows: count I—taking money or personal property in excess of $400 (Pen. Code, § 487, subd. (a));[1] count II—fraudulent appropriation in excess of $400 (§ 506); and count III—fraudulent appropriation of personal property in excess of $400 from an elder adult within her care and custody (§ 368, subd. (c)). The district attorney alleged as to each count the defendant took funds or property aggregating over $50,000 (§ 12022.6, subd. (a)).

On May 20, 1994, the court granted defendant's motion to set aside count I (§ 995) and struck the excessive taking allegations on the remaining counts.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

On May 24, 1994, the court denied defendant's motion to dismiss for delay in charging. The court specifically held:

"THE COURT FINDS THE DEFENDANT HAS BEEN PREJUDICED BY THE PASSAGE OF TIME AND THAT ATTORNEY TOM CLARK SUBMITTED PAPERWORK TO THE DISTRICT ATTORNEY'S OFFICE THAT WAS COMPLETE AND LAID OUT ISSUES BUT THE DELAY WAS NOT DUE TO LACK OF INTEREST OR INTENTIONAL.

"THE COURT FINDS NO INTENTIONAL DELAY UPON THE OFFICE OF THE DISTRICT ATTORNEY AND THE DELAY WAS JUSTIFIED DUE TO THE LACK OF PERSON[N]EL AND NO NEGLIGENCE UPON THE OFFICE OF THE DISTRICT ATTORNEY."

On May 25, 1994, the court renumbered counts II and III as counts I and II and amended count II to include appropriation. The defendant then pleaded not guilty to the latter charge and jury trial commenced.

On June 14, 1994, the jury found defendant guilty of both counts.

On August 3, 1994, the court denied defendant probation and sentenced her to the three-year middle term on count II and the two-year middle term on count I. The court stayed the latter sentence (§ 654) and ordered her to pay $225 for the cost of preparing the presentence investigation report. The court also ordered that direct restitution to the victim would be determined at a hearing scheduled for September 21.

Defendant filed a timely notice of appeal.

FACTS

*Facts From the Hearing on Motion to Dismiss*

In 1991, the relatives of Mary LaBarre retained Bakersfield attorney Thomas Clark in connection with her pending conservatorship proceeding. The relatives instructed Clark to oppose the nomination of defendant, LaBarre's financial planner, as conservator, but not to oppose the conservatorship.

On December 17, 1991, Clark, a former Kern County deputy district attorney, prepared a memorandum summarizing the evidence and analyzing the potential criminal charges that could be brought against defendant. The evidence primarily consisted of defendant's deposition. The memo was lengthy and included case and statutory authority.

Two days later, Clark met with Kern County Sheriff's Detective Lawrence Emhoff and Kern County Conservator Investigator Randall Dickow to provide information and discuss the possible criminal investigation of defendant. Clark did not recall if he gave Detective Emhoff a copy of his December 17 memo but believed he did. In any event, he discussed the contents of the memo at length with Emhoff. Investigator Dickow's case notes documenting the meeting stated the trio met: "[R]e criminal charges & KCSO's investigation. Also discussed was the ability to use Prob. Code § 2616 to further question Diane & *all* members of her family. KCSO to pursue investigation and take to DA when ready."

On December 23, 1991, Attorney Clark wrote Emhoff, at the latter's request, and provided copies of declarations of Suzanne Toothman, social services designee, and Diane Lopez, housekeeping supervisor, at LaBarre's care facility, Pacific Regency Care Center of Bakersfield (Pacific Regency). These declarations had previously been filed in the conservatorship action.

Shortly before April 30, 1992, Clark met with Assistant District Attorney Stephen Tauzer. On April 30, Clark wrote Tauzer at the latter's request and supplied additional information. At some point, Clark delivered a copy of his December 17 memo and portions of defendant's deposition to Tauzer. The memo referred to follow-up work that needed to be done, particularly the need for statements from various witnesses and bank and medical records. Tauzer testified Clark had left records and/or transcripts with him some months prior to March 26, 1993. However, at that time there had been no police involvement in the investigation and Tauzer maintained the case was not sufficiently prepared to be filed as a criminal matter. Clark agreed the case needed investigation when he referred the matter to the district attorney's office.

Tauzer further testified there was some indication the case should go to the sheriff's department for investigation. Tauzer discussed the matter with Investigator Dickow. Dickow agreed to investigate further but he was later terminated from public employment for theft from an elder adult (§ 368, subd. (c)). Tauzer said he intended to do something with Clark's information but the case was one of numerous matters referred directly by victims to the district attorney's office. Tauzer explained the district attorney's office tries to fit such cases into its resources and the sheriff's department's resources when possible. At the time Clark submitted his information, the district attorney's staff was reduced by 15 attorneys, the misdemeanor attorneys were cut from 15 to 3, the office had no more fraud attorneys, and the sheriff's department was experiencing similar personnel cuts.

On March 26, 1993, Clark wrote District Attorney Edward Jagels about the documents he had left with Tauzer and complained about the latter's

inaction. At that point, the matter was given to Deputy District Attorney Terry Pelton for review. On April 14, 1993, Pelton wrote a memo indicating there was a prosecutable case and the matter should be sent to the Bakersfield Police Department (BPD) or one of the district attorney investigators for investigation.

On April 16, 1993, Pelton requested an investigation by one of the district attorney investigators.

In late April or early May 1993, Deputy District Attorney Catherine Goetz received the case file—a bundle of papers which had not been assigned a case number. Goetz was assigned to a grant program, the prison section, and was not as busy as other deputies in the district attorney's office. At the request of Investigator Cheryl Gottesman, one Dan Sparks of the district attorney's office asked Goetz to look at the case and determine whether criminal charges could be filed. Goetz briefly looked through the papers, talked with Gottesman, and determined further investigation was needed. Goetz concluded the case was not ready for filing because the district attorney's office needed to interview witnesses and secure doctor's reports.

In early June 1993, Goetz and Gottesman interviewed Mary LaBarre. Goetz had the case for another three weeks and then became involved in the trial of a high profile case requiring investigation. She asked Gottesman to inform Dan Sparks she did not have time to follow through the intricacies of this matter. She then referred the case back to Gottesman.

On July 15, 1993, Gottesman sent Goetz a memorandum indicating she had partially completed her investigation and had received some of the missing records. Goetz was still involved in the unrelated case and advised Gottesman she would be unable to put the case together. Goetz returned the case to Dan Sparks.

On August 14, 1993, Pelton generated an office memorandum concerning the case. On September 27, 1993, Clark wrote Gottesman, stating, "I haven't heard from you for some time, can you please advise me as to the status of the investigation." Pelton ultimately filed the case after the investigation was complete. The filing form was dated November 11, 1993.

On November 18, 1993, Clark wrote District Attorney Jagels a letter, offered his assistance in the criminal investigation, and expressed his hope that charges would be filed. The district attorney's office issued the complaint on November 22, 1993, and Clark wrote Jagels again the following day.

Assistant District Attorney Tauzer testified there was no conscious or deliberate delay in the investigation of this case. Tauzer said any delay was due solely to the lack of resources. Tauzer said he was the only person handling major fraud cases at the time and he had several that were in trial. One of the cases was a $20 million fraud matter and the district attorney's office was conducting the original investigation. The court took judicial notice that Tauzer also tried a complicated case involving a "Ponzi scheme"[2] during this period. Tauzer said the instant case was investigated faster than normal because of "the squeaky wheel syndrome."

At the hearing on motion to dismiss, Deputy District Attorney Lynn Strom, the prosecutor in this matter, claimed her case file consisted of two boxes of material and her witness list contained twenty-six names.

Defendant testified she would have been available for service of an arrest warrant between December 1991 and November 1993. She had lived at the same address in Bakersfield since 1986. Although her office address changed in 1991, defendant had telephone service listed to her offices in her name.

In her moving papers, defendant included a copy of the September 21, 1992, deposition of Robert LaBarre, the ex-husband of Mary LaBarre, for purposes of the conservatorship proceeding. At the deposition, Robert, age 91, testified he wed Mary in 1978 and left her on August 4, 1991, because they did not get along. Their dissolution was pending at the time of the deposition. Robert did not know what Mary and defendant did after he left, although he briefly spoke to Mary on one occasion. During their marriage, the couple had limited visits with some of Mary's relatives, including Michael Otten, Helen Leake, John Simco, Barbara Simco, and Rosemary Pinkstaff. They had more frequent visits with Mary's sister, Frances Howard. Robert said Mary did not get along with Frances but still visited her when the latter was in the hospital. Robert said Mary was not close to her sister Barbara. Moreover, Robert did not believe Mary loved her sisters, based upon her general attitude. Nevertheless, Mary called her sisters occasionally. Roberta Simco was the only relative who visited Mary when the latter was in the hospital.

In June 1990, Mary consulted Attorney George Manolakas to make her first will. She told Robert she wanted to leave money to her sisters and the

[2]A "Ponzi scheme" is a fraudulent arrangement in which an entity makes payments to investors from moneys obtained from later investors rather than from any "profits" of the underlying business venture. The fraud consists of funneling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion a legitimate profitmaking business opportunity exists and inducing further investment. (*In re United Energy Corp.* (9th Cir. 1991) 944 F.2d 589, 590, fn. 1.)

Oildale church and priest. Mary's will also left money to Robert's son and included a trust to pay Robert investment interest for life. Robert no longer expected the trust income at the time of the deposition. Robert said Mary had a good understanding of her assets and what she wanted to do with them. She occasionally kept jewelry and some bonds in her safe deposit box and generally knew where the key was during their marriage. Mary was frugal with money and shared trash cans with a neighbor and raised food in a garden to save expenses.

Robert and Mary had a close relationship with some neighbors but not with others. Mary had a restricted driver's license and Robert did most of the driving. Mary had a 1978 Lincoln Continental with low mileage but it was in "pretty bad shape." The couple discussed the possible purchase of a new vehicle before Robert left. Robert said Mary bought "top of the line" items such as clothes and cars and gave "top of the line" gifts but he was unaware of any sizable monetary gifts. Robert knew Mary gave gifts to defendant.

Mary made independent investment decisions and was in control of her decisionmaking faculties when she and Robert separated. Defendant performed well as Mary's financial adviser and made profitable investments for her. In his opinion, Mary's relationship with defendant was closer than that with her own sisters. Robert trusted defendant.

Mary had been a schoolteacher and had a strong interest in seeing youth advance in education. Although Mary helped Rosemary Pinkstaff's son, Roger Pinkstaff, Robert never heard Mary discuss helping defendant's son. He also heard defendant took pretty good care of Mary after he left her. Defendant and Mary bought a Lexus and defendant used the new vehicle to run errands for Mary. Defendant and Mary also took $10,000 from Mary's checking account and gave it to one of defendant's sons.

Defendant's moving papers contained a declaration by defense counsel. In that declaration, counsel stated defense investigator Charles Feer had learned of the death of Robert LaBarre. At the hearing, counsel claimed he had a printout from the National Witness Death Index indicating the death of Mr. LaBarre on July 19, 1993, in Arkansas. Counsel stated at the hearing he had requested a certified copy of LaBarre's certificate of death but had not yet received it. Defense counsel asked and the court allowed him to introduce the rest of the evidence subject to receipt of the certificate of death.

Defendant's moving papers also referred to the preliminary hearing testimony of Antonio Perelli-Minetti, M.D., a psychiatrist who evaluated Mary on November 2, 1991. Dr. Perelli-Minetti testified a radiologist found Mary

suffered from a moderate amount of central and cortical atrophy. Such atrophy usually indicates an Alzheimer's type of process. The radiologist also found multiple deep white matter infarctions and encephalomalacia, which were little strokes. Perelli-Minetti further testified that Alzheimer's disease, in general, is a slowly progressing disease.

At the hearing, defense counsel claimed he had subpoenaed Mary but she was not present. Counsel said Coroner-Public Guardian Helen Frankel was appearing to tell the court that Mary was physically and mentally frail. Therefore, it would not be in her best interest to appear in court. Defense counsel did not put on any evidence relating to Mary's condition because the court said it found prejudice based upon Robert's deposition and his alleged unavailability.

The court nevertheless denied the motion to dismiss, stating in relevant part:

"In this particular case, I do not agree wholeheartedly with the position asserted by either side. I did find prejudice. I still find prejudice. Curiously that works both ways.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"I don't think there was a lack of interest on the part of the District Attorney's Office. I do not find that this was a case where there was justifiable delay, because there was a lot of investigation work to be done.

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"This really was, quite frankly, pretty well laid out. Certainly there was a lot more that needed to and could have been done, and should have been done. But, I'm not finding that the delay was justified because of the need for the extensive further investigation. I think the basic bare bones of it, and a lot of the delay, supporting detail, were certainly all laid out.

"To the extent that the Arch[e]rd . . . case requires a finding of intentional delay, I do not find intentional delay.

"When Mr. Tauzer testified about the squeaky wheel getting the oil, or the grease, as I had always heard the phrase, I do not think that indicated a lack of interest, but instead a lack of personnel.

"To the extent that the standard is negligence, negligence to me requires not perfection, but requires someone falling below a standard of a reasonable

practitioner. And, a reasonable practitioner can only do that which can be accomplished within the twelve working hours per day that I think we expect or demand that the professionals put in every day.

"I find, in this particular case, that there was justification for the delay, and I find this to be certainly a case of first impression . . . . There was unrefuted evidence with regard to the inattention to this particular case, and that is the lack of personnel.

"I had well in mind the testimony of Mr. Tauzer indicating that, due to budgetary restraints, the number of Deputy District Attorneys had been reduced.

"Certainly he did testify that, at the time this particular matter was presented by Mr. Clark, there was only one deputy assigned to doing this type of crime. I think he was the one, in fact, and as I recall, he did testify that during a considerable period of time there, he was involved in trying one of these cases. Nobody asked him.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"I'm going to find that the delay in this case was not intentional, in terms of blatantly or with a willful purpose ignoring it, hoping that it would go away.

"Also, I find that it was not negligent, because, in order to do that, I would have to find that there were sufficient Deputy District Attorneys available to evaluate, and to do that which was necessary in order to get subpoenas out, and do all the other things necessary to be able to proceed to a preliminary hearing within ten days from the date that the Complaint was filed in the Municipal Court and the arrest warrant was issued and served.

"As I say, I do not find either to be the situation. This was not a lack of interest. It was not a matter of negligence. It was a lack of money.

"I found no case, there is no case that supports that justification that I've indicated, which means that if the matter goes to trial, and there is an adverse result to the Defendant . . . she clearly has an appealable issue . . . ."

*Facts From the Jury Trial\**

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

*\*See footnote, ante, page 899.*

DISCUSSION

I. *Did the Trial Court Erroneously Deny Defendant's Motion to Dismiss for Undue Delay in Charging?*

■ Defendant contends she was denied fundamental fairness by the prosecution's almost two-year delay in bringing charges. Defendant maintains this denial was particularly acute where (a) former prosecutor Thomas Clark apprised the district attorney's office of the relevant facts via a detailed writing with supporting documentary evidence and (b) the district attorney's office was on notice the alleged victim's mental state was deteriorating.

■ The right to a speedy trial is guaranteed by the Sixth Amendment of the United States Constitution, which provides "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." Essentially the same right is guaranteed by article I, section 15 of the California Constitution, which provides: "The defendant in a criminal cause has the right to a speedy public trial . . . ." The federal speedy trial right attaches once a defendant is accused. A person stands accused once a formal indictment or information is filed or he or she is subject to the actual restraints imposed by arrest and holding to answer a criminal charge. The California speedy trial right has been held to be broader than the federal right in that it attaches as early as the filing of a complaint, and thus covers prearrest delay. (*People* v. *Hannon* (1977) 19 Cal.3d 588, 608 [138 Cal.Rptr. 885, 564 P.2d 1203]; *People* v. *Belton* (1992) 6 Cal.App.4th 1425, 1428-1429 [8 Cal.Rptr.2d 669].)

■ The First District Court of Appeal has held there are two elements to consider in discussing the right to a speedy trial. The first is the stage at which the right attaches. The second is the stage at which the presumption of prejudice arises. (*People* v. *Lawson* (1979) 94 Cal.App.3d 194, 198 [156 Cal.Rptr. 226].) During the period between the crime and the arrest or the filing of the complaint, the speedy trial doctrine does not apply. The right to due process is involved during that period. However, the test is the same, i.e., any prejudice to the defendant resulting from the delay must be weighed against the justification for that delay. Upon arrest or filing of the complaint, the right to a speedy trial attaches but at this stage there is no presumption of prejudice. The presumption of prejudice does not arise until the filing of an indictment or information. (*People* v. *Butler* (1995) 36 Cal.App.4th 455, 462-464 [42 Cal.Rptr.2d 279]; *People* v. *Belton, supra,* 6 Cal.App.4th at p. 1429; *Scherling* v. *Superior Court* (1978) 22 Cal.3d 493, 504-505 [149 Cal.Rptr. 597, 585 P.2d 219]; *People* v. *Archerd* (1970) 3 Cal.3d 615, 639-640 [91 Cal.Rptr. 397, 477 P.2d 421].)

If the alleged delay occurs prior to the filing of an indictment or information, there is no presumption and a three-step analysis is employed to determine whether the defendant's rights have been violated. First, the defendant must show he has been prejudiced by the delay. Second, the burden then shifts to the prosecution to justify the delay. Third, the court balances the harm against the justification. (*People* v. *Lawson, supra,* 94 Cal.App.3d at p. 198, citing *Jones* v. *Superior Court* (1970) 3 Cal.3d 734 [91 Cal.Rptr. 578, 478 P.2d 10]; *People* v. *Archerd, supra,* 3 Cal.3d at pp. 639-642; *People* v. *Pellegrino* (1978) 86 Cal.App.3d 776, 779-781 [150 Cal.Rptr. 486].) If the delay occurs after the filing of the indictment or information, prejudice is presumed and the prosecution must then show justification for the delay. (*People* v. *Lawson, supra,* 94 Cal.App.3d at p. 198.)

In the instant case, there is no claim of postinformation delay and in California, prejudice will not be presumed from delay which occurs before arrest or the filing of an indictment or information. Thus, the burden is on defendant to show such prejudice. Prejudice may be shown by loss of material witnesses due to lapse of time or loss of evidence because of fading memory attributable to the delay. (*People* v. *Butler, supra,* 36 Cal.App.4th at p. 466.) If the defendant makes such a showing, the burden shifts to the prosecution to justify the delay. (*People* v. *Pellegrino, supra,* 86 Cal.App.3d at p. 779.) If defendant fails to show prejudice, the court need not inquire into the justification for the delay since there is nothing to "weigh" such justification against. This is particularly true when there is no evidence the delay was for the purpose of weakening the defense. (*People* v. *Lawson, supra,* 94 Cal.App.3d at pp. 198-199.)

Finally, if defendant has met his burden, the court must balance the harm to the defendant against the justification for the delay. (*Scherling* v. *Superior Court, supra,* 22 Cal.3d at p. 505; *Jones* v. *Superior Court, supra,* 3 Cal.3d at p. 740.) The facts and circumstances must be viewed in light of (1) time involved; (2) who caused the delay; (3) the purposeful aspect of the delay; (4) prejudice to the defendant; and (5) waiver by the defendant. If the government deliberately uses delay to strengthen its position by weakening that of the defense or otherwise impairs a defendant's right to a fair trial, an inordinate preindictment delay may be shown to be prejudicial. However, a prosecutor is entitled to a reasonable time in which to investigate an offense for the purpose of determining whether a prosecution is warranted. (*People* v. *Archerd, supra,* 3 Cal.3d at p. 640.) This court has held police negligence in evidence gathering or case preparation for evaluation by the district attorney cannot justify a lengthy prearrest delay. (*Penney* v. *Superior Court* (1972) 28 Cal.App.3d 941, 953 [105 Cal.Rptr. 162].) Whether prearrest

delay is unreasonable and prejudicial to the defendant is a question of fact. If the court concludes the defendant's speedy trial right has been abridged, the remedy is dismissal of the charge. (*People* v. *Belton*, *supra*, 6 Cal.App.4th at p. 1431, fn. 3.) The trial court's ruling must be upheld on appeal if it is supported by substantial evidence. (*People* v. *Mitchell* (1972) 8 Cal.3d 164, 167 [104 Cal.Rptr. 348, 501 P.2d 916].)

As noted above, the trial court denied defendant's motion for dismissal on the grounds of charging delay, stating in relevant part:

"In this particular case, I do not agree wholeheartedly with the position asserted by either side. I did find prejudice. I still find prejudice [because Robert LaBarre was no longer available]. Curiously that works both ways. . . .

". . . . . . . . . . . . . . . . . . . . . . . . . .

"I find, in this particular case, that there was justification for the delay . . . .

". . . . . . . . . . . . . . . . . . . . . . . . . .

"I had well in mind the testimony of Mr. Tauzer indicating that, due to budgetary restraints, the number of Deputy District Attorneys had been reduced.

"Certainly he did testify that, at the time this particular matter was presented by Mr. Clark, there was only one deputy assigned to doing this type of crime. I think he was the one, in fact, and as I recall, he did testify that during a considerable period of time there, he was involved in trying one of these cases. Nobody asked him.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"I'm going to find that the delay in this case was not intentional, in terms of blatantly or with a willful purpose ignoring it, hoping that it would go away.

"Also, I find that it was not negligent, because, in order to do that, I would have to find that there were sufficient Deputy District Attorneys available to evaluate, and to do that which was necessary in order to get subpoenas out, and do all the other things necessary to be able to proceed to a preliminary hearing within ten days from the date that the Complaint was filed in the Municipal Court and the arrest warrant was issued and served.

"As I say, I do not find either to be the situation. This was not a lack of interest. It was not a matter of negligence. It was a lack of money."

Defendant contends on appeal: "Prejudice was unquestionably present here. While the prosecution spent its time ignoring Tom Clark's letters, calls and the evidence he presented, Robert LaBarre, Mary LaBarre's ex-husband and a vital witness for appellant, died. The alleged victim, Mary LaBarre, so declined in mental health that her ability to confirm that she made gifts to appellant was forever lost during the time interval between the alleged acts and the formal charges (i.e., between mid-to-late 1991 and November of 1993[).]

"In balancing these factors, the prejudice suffered by appellant far out-weighs the 'justification' for the delay offered by the prosecution. In fact, the justification, be it labeled deliberate indifference or negligent avoidance, boils down to 'we were too busy.' Given the time-sensitive case facts, 'too busy' is not an acceptable excuse when it is certain that the loss of evidence will inevitably result from delays in pursuing the case.

". . . By any standard, a heavy caseload is not a sufficient reason to put an accusation against someone on the 'back burner' for two years, especially when that delay causes such an insurmountable detriment to the ability of that person to defend herself.

"Applying the five-part test of **Archerd**, cited above, the court must weigh and balance the following: (1) the delay here was at least eighteen months between notice to the District Attorney and the commencement of the investigation; during this time, Mr. Clark repeatedly contacted the office to get the investigation moving; (2) the delay was caused by the inattention of the District Attorney during this time period despite acknowledging early on that the case looked prosecutable and that, as Mr. Tauzer said in his 1993 memorandum to District Attorney Jagels, not much would be required of the police to put the case together; (3) the purposeful aspect of the delay is demonstrated because of the documented deliberate inattention to it despite knowledge of the facts of the case, the time-sensitive nature of the evidence (the age of the major witness and her ongoing mental deterioration), and the repeated contacts by Mr. Clark urging investigation; (4) prejudice to the defendant was found (and virtually conceded by the prosecution); and (5) there was no waiver by appellant.

"The loss of Robert and Mary LaBarre as witnesses, resulting directly from the delay by the prosecutor's office, is one that prejudiced the defend-ant and violated her due process rights. Because of this loss, appellant lost

the most effective way to prove that Mary LaBarre's gifts to appellant were given in a gesture of loving friendship for a mutually satisfying relationship. . . . The charges must be dismissed."

■ The actual amount of time between the commission of the suspected crime and the filing of charges is not the critical issue in determining prejudice. Prejudice sufficient to sustain dismissal has resulted after a delay of five months, while charges filed after ten years have been upheld. Here, the trial court found prejudicial precharging delay. Under the three-step test for determining a due process violation, the prosecution must show justification for the delay. (*People* v. *Hartman* (1985) 170 Cal.App.3d 572, 579 [216 Cal.Rptr. 641].)

Assistant District Attorney Tauzer testified he intended to investigate further with the information Clark had furnished but the case was one of many referred directly to the district attorney's office by crime victims. Tauzer said the district attorney's office tries to fit such cases into its resources and the resources of the Kern County Sheriff's Department where possible. However, the resources of both agencies were becoming more and more limited at the time Clark submitted his memorandum. The district attorney's office sustained a reduction in 15 staff attorneys. Budget cuts resulted in the elimination of misdemeanor fraud attorneys. The sheriff's department experienced similar personnel cuts. Tauzer further explained he was the only person handling major fraud cases at the time of the cuts and he had several matters in trial. One of those matters was a $20 million fraud case and the district attorney's office was handling the original investigation in that matter. Tauzer emphasized there was no conscious or deliberate delay in investigating the instant case and any delay was due solely to lack of resources.

■ The due process clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. Rather, the task of the reviewing court is to determine whether precharging delay violates the fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency. Prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. Imposition of such a duty would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself. Investigative delay is fundamentally unlike delay undertaken by the government solely to gain tactical advantage over an accused because investigative delay is not so one-sided. A prosecutor abides by elementary

standards of fair play and decency by refusing to seek indictments until he or she is completely satisfied the defendant should be prosecuted and the office of the prosecutor will be able to promptly establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of orderly expedition to that of mere speed. In sum, to prosecute a defendant following investigative delay does not deprive the defendant of due process, even if his or her defense might have been somewhat prejudiced by the lapse of time. (*United States* v. *Lovasco* (1977) 431 U.S. 783, 790-796 [52 L.Ed.2d 752, 759-763, 97 S.Ct. 2044], rehg. den. 434 U.S. 881 [54 L.Ed.2d 164, 98 S.Ct. 242].) Moreover, the necessity of allocating prosecutorial resources may cause delays valid under the *Lovasco* analysis. (*United States* v. *Medina-Arellano* (5th Cir. 1978) 569 F.2d 349, 353.) ▮ Thus, the difficulty in allocating scarce prosecutorial resources (as opposed to clearly intentional or negligent conduct) was a valid justification for delay in the instant case.

In evaluating a claim of preaccusation delay, any prejudice to the defendant resulting from the delay must be weighed against the justification for the delay. (*People* v. *Butler*, *supra*, 36 Cal.App.4th at p. 466.) Even a minimal showing of prejudice may require dismissal if the proffered justification for delay is insubstantial. By the same token, the more reasonable the delay, the more prejudice the defense would have to show to require dismissal. Therein lies the delicate task of balancing competing interests. (*People* v. *Hartman*, *supra*, 170 Cal.App.3d at pp. 582-583.)

Here, the delay between notice to the office of the district attorney and commencement of investigation was actually 12 months. During that one-year period, Assistant District Attorney Tauzer spoke with Investigator Dickow and the latter agreed to investigate. However, Dickow was later terminated from public employment. The lower court reviewed the evidence and reasonably concluded the delay in investigation and charging was caused by lack of adequate personnel to investigate and prosecute the case. Defendant nevertheless claims the delay was marked by "deliberate inattention" or "negligent avoidance." However, this characterization of the district attorney's conduct ignores Tauzer's testimony about the severe cuts in personnel handling fraud cases in his office.

As to prejudice to the defendant, the People properly point out there were 21 witnesses who could testify to some degree as to Mary's competence at the time of the alleged offenses. These witnesses included Attorney Manolakas, Dr. Anderson, Mr. and Mrs. Somers, Ombudsman Parks, Dr. Perelli-Minetti, Ms. Toothman, Ms. Kelty, Ms. Lopez, Ms. Pacheco, Ms. Barkalow, Ms. Knapp, Mr. Timmons, Attorney Fillerup, Mrs. Fillerup, Dr. Hsu, Mr.

Dunn, Attorney Russell, Mr. Bensusen, Attorney Thompson, and Dr. Matis. Moreover, a number of these witnesses (Parks, Fillerup, Dunn, Russell, Bensusen, and Thompson) were available to testify to the affection between defendant and Mary. Although defendant did not waive any delay, the People maintain she waived any claim of prejudice attributable to Mary's alleged unavailability because she did not present any evidence of Mary's condition at the hearing on motion to dismiss.

The lower court carefully examined the foregoing factors, acknowledged on the record the extreme difficulty of the task before it, and ultimately concluded the delay was justified given the severe budgetary restraints upon the offices of the Kern County District Attorney and sheriff at the time of Clark's initial contact. The lower court's finding was primarily based upon the testimony of Assistant District Attorney Tauzer. The direct evidence of one witness entitled to full credit is sufficient for proof of any fact except where additional evidence is required by statute. (Evid. Code, § 411.) Defendant's argument is rejected.

II.-IV*

. . . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed. The trial court is ordered to strike the order directing defendant to reimburse the County of Kern $225 for preparation of the presentence investigation report and to amend the abstract of judgment accordingly. A certified copy of the abstract is to be sent to the Department of Corrections.

Stone (W. A.), J., and Harris, J., concurred.

A petition for a rehearing was denied July 23, 1996, and appellant's petition for review by the Supreme Court was denied October 2, 1996. Kennard, J., Chin, J., and Brown, J., were of the opinion that the petition should be granted.

*See footnote, *ante,* page 899.