Filed 8/31/15  P. v. Bickham CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>BRIAN BICKHAM et al.,<br><br>        Defendants and Appellants. | A137657<br><br>(Contra Costa County<br>Super. Ct. No. 121340-4) |

Ten years after sexually assaulting 18-year-old Jane Doe, defendants Brian Bickham and Lorenzo Preston were found guilty of rape of an intoxicated woman (Pen. Code, §261, subd. (a)(3)) and sentenced to six and eight years in state prison, respectively.  Defendants appeal, both contending that a near 10-year delay in charging them violated their rights to due process and a speedy trial.  Bickham additionally contends that the trial court improperly instructed the jury on the burden of proof applicable to the question of whether Doe had consented to their sexual intercourse, while Preston additionally contends that the trial court erred in excluding evidence of condoms found in the trunk of Doe's car.  We conclude defendants' arguments lack merit, and we affirm.

## EVIDENCE AT TRIAL

### Jane Doe

It was the summer of 2002.  Close friends Jane Doe and Tenille Gresham lived in Antioch and had just graduated from high school.  They were dating two men who were cousins, Doe a man named J.H., and Gresham a man named Freddie.  The two women

1

also spent time that summer with two of Gresham's friends, one of whom was Patrice Buckner.

During that time period, Doe and her friends drank "a lot." According to Doe, who was five feet, three inches tall and weighed between 130 and 140 pounds at time, she could handle a lot of alcohol, but she never drank so much that she passed out or got sick. According to Gresham, Doe was a heavy drinker but she could "handle herself," and Gresham never saw her get so drunk that she was stumbling or vomiting.

That summer, an apartment in Antioch became a "party place" for the women—a place they could hang out, watch television, play videogames, drink, and smoke. They had originally been invited to the apartment by Bickham, whom Gresham had previously dated. Doe also knew Bickham from school and through a cousin.

According to Doe, on August 4, she got into an argument with her boyfriend, and Gresham convinced her to go out instead of sitting around her house, crying. Doe agreed, making plans to meet Gresham at the apartment and then go out together from there. Doe went to the apartment around 5:00 p.m., where she found four men hanging out— Bickham, Orlando Ellison, Alphonso Wilson, and a fourth she did not know (presumably either Preston or Isaac Prince, both of whom were at the apartment that evening). After waiting a while for Gresham to show up, Doe eventually decided to go get cigarettes, and defendants asked if they could go with her. Doe estimated that it was around 6:00 p.m. when they left the apartment.

In the parking lot of Bottom's Up Liquor, Doe ran into Gresham, who was in a car with J.H. and Freddie. There was some tension, with Doe yelling at J.H. and J.H. yelling at Doe and defendants. Doe eventually drove off, returning to the apartment with defendants.

Back at the apartment, Doe hung out for a while, stepping outside for a bit to smoke and use her "two-way."[1]

---

[1] Doe described a "two-way" as a device "like a pager" or "like texting" where if "you are sitting next to someone, you could beam your information toward each other." She also had a cellphone.

Returning inside the apartment, Doe eventually sat down on the couch, and someone asked if she wanted a drink. She said yes, and Ellison poured her a glass of Kool Aid. After she drank that, someone, either Bickham or Preston, poured alcohol into an eight-inch cup for her, filling it about halfway. Doe recalled defendants also drinking. One of the men was next to her on the couch and another—she thought it was Bickham—was on the floor in front of her. She talked with the men about her frustrations with her boyfriend and the confrontation that had occurred at the liquor store. At some point, she also called Gresham a number of times from the apartment phone but was unable to reach her. As she sipped her drink, she started feeling really hot, light-headed, dizzy, and like the room was moving, so she walked to the bathroom and splashed water on her face. She remembered "kind of falling [a] little bit" and "everything went black at that point." After that, Doe only had "flashes" of memories—of people asking if she was okay, of water, of Gresham's voice, of seeing Bickham and Ellison. She had a vague memory of being treated in the ambulance and then she woke up in the hospital. Doe did not know why she was in the hospital until her father told her she had been sexually assaulted.

Doe testified that she never agreed to have sex with anyone at the apartment that evening.

**Tenille Gresham**

On August 4, 2002, Doe wanted to go over to the apartment early in the day, but Gresham had other things she wanted to do first. She went out to run errands with J.H. and Buckner, and they stopped at Bottom's Up Liquor while it was still light out. Doe pulled up in a car with three or four men (Gresham did not recall Bickham being in the car), and J.H. became very upset. As Gresham described it, Doe knew she was "caught," meaning she had been caught with a "bunch of guys," none of whom was her boyfriend.

Gresham and Buckner returned to Gresham's house around 9:00 p.m. When they got there, Gresham's mother was upset about voice mail messages Doe had left, which Gresham described as "inappropriate." Gresham and Buckner then headed to the apartment. When they got there, everyone was "wasted." Gresham did not see Bickham or Doe, so she thought perhaps Doe had left. She sat down on the couch for about 20 or

3

30 minutes, during which time she saw three or four different men going into and out of the bathroom. She eventually had to use the bathroom herself, and she walked over to the bathroom door. There was a "bunch of guys" standing around the bathroom, listening at the door and laughing. She heard very brief moaning, like somebody having sex, and they told her there was someone in there and to go sit down. She returned to the couch and sat down, again noticing men going back and forth to the bathroom and listening with their ears up against the bathroom door. Gresham could not recall the order in which any of the men exited the bathroom or returned to the living room.

Eventually, the men moved away from the door, and Gresham got up and walked back over to the bathroom. She did not recall seeing anyone come out of the bathroom as she approached it. Inside, Gresham found Doe passed out over the side of the bathtub with her legs spread open, no clothing on from the waist down, and her bra and shirt lifted up with her breasts hanging out. Her hair was wet, she was foaming at the mouth, and she had semen running down her legs. Gresham was unable to wake her up or move her out of the bathroom.

Panicking and wanting to get help, Gresham and Buckner tried to leave the apartment. One of the men would not let them leave, going so far as to throw Buckner down, but then, according to Gresham's recollection at trial, Bickham stepped in and told him to let them leave. She and Buckner were finally able to leave the apartment about five minutes after they discovered Doe.

Gresham and Buckner went to pick up J.H. They returned to the apartment and J.H. kicked in the door, but Doe was no longer there and her car was gone. At some point, Gresham also contacted Doe's mother and then drove to her house. While she was there, some of the men from the apartment—not including Bickham—showed up with Doe.

At the time of trial, Gresham did not recall speaking to the police shortly after the incident, but she was in fact interviewed twice the day of the assault. Antioch police officer MacNiven testified that he interviewed Gresham around 3:00 a.m. that morning. According to Gresham, she had run into Doe at Bottom's Up Liquor around 8:00 p.m. the

4

prior evening. She and Buckner later went to the apartment around 1:00 a.m., expecting to find Doe. When Gresham walked into the apartment, one of the men told her how much alcohol Doe had consumed. Gresham heard a noise in the bathroom that sounded like a female moaning or getting sick, and she thought it was Doe. At about 1:15 a.m., she tried to get into the bathroom, but someone inside was trying to lock her out. She was able to force her way in by kicking the door in, and Bickham quickly left the bathroom. Doe was inside, unconscious, unclothed, and draped over the side of the bathtub with her legs spread open.

Gresham walked back into the living room, where she saw Bickham pushing Buckner onto the couch. She and Buckner tried to leave, but Bickham grabbed Gresham's arm. One of the other men told him, "Just let them go," and they were able to leave, at which point it was around 1:40 a.m. Gresham identified the men at the apartment as Bickham, Preston, Ellison, and Wilson.

Gresham was again interviewed around 9:00 a.m. by Antioch police detective Vince Augusta, the lead investigator assigned to the case. He testified that she provided the following account: Gresham ran into Doe, Wilson, and Preston at a liquor store around 8:00 p.m. the night before. Around 1:15 a.m. the following morning, she and Buckner went to the apartment, where they found Wilson, Preston, Ellison, and Bickham. Once in the apartment, she saw Wilson at the bathroom door, laughing and trying to open the door with a butter knife. The door eventually opened, and Bickham came out. She also saw Wilson and Ellison and then Ellison and Preston go into the bathroom. As Wilson and Ellison came out, they were pulling up or adjusting their pants in some way. Gresham finally forced her way into the bathroom, where she found Doe bent backwards over the bathtub, naked from her waist down with semen on her legs. According to Gresham, Preston was in the bathroom at that time.[2] Gresham could not wake Doe up

---

[2]    Detective Augusta described Gresham's account of the sequence of events as "confusing."

5

and she wanted to leave the apartment to get help, but Bickham was preventing anyone from leaving. She eventually forced her way past him and left.

**Brian Bickham**[3]

During the summer of 2002, Bickham spent a lot of time hanging out at an apartment in Antioch where Ellison and Wilson lived. He would go there to play video games, listen to music, smoke marijuana, and drink alcohol. Preston, who was his cousin, also hung out there. Throughout the summer, he saw Gresham and Doe at the apartment several times. He had previously dated Gresham, and he also knew Doe in passing.

On August 4, Bickham and Preston went to hang out at the apartment. Bickham recalled Doe being there, but he had no recollection of when she arrived, nor did he recall going to a liquor store to buy cigarettes or alcohol. He also did not recall whether he had smoked marijuana that evening, although he acknowledged it was a possibility since it was something he did regularly.

Bickham did, however, remember consuming rum that evening, drinking it straight out of a six-inch glass. Doe was also drinking rum out of a similar glass. He estimated that he drank two and a half glasses and recalled feeling intoxicated and later having a hard time walking and balancing.

At some point late in the evening, Doe was sitting on the living room couch, and Bickham was sitting on the floor between her legs. He did not recall specifically what they were talking about, although he remembered it had something to do with sex. Doe suddenly stood up and announced she had to "pee." She looked back at Bickham and asked, "You coming?" He reached his hand out, she helped him up, and they walked to the bathroom. Bickham testified Doe walked to the bathroom on her own, and he did not recall her slurring her speech.

Bickham and Doe went into the bathroom, and he shut the door. After they kissed a little bit, Bickham pulled her pants down, and they had sex without a condom. Doe was

---

[3] Preston did not testify at trial.

moaning in pleasure, and at no time did she say, "No," or tell him to stop. They both then pulled up their pants, and he left the bathroom, leaving Doe behind. At no time did she stumble or sway, nor was she unable to get dressed.

When Bickham left the bathroom, Wilson, Ellison, and Prince were near the bathroom door. They hit him on his shoulder and asked, "How was it?" Bickham "just smiled and shrugged it off." Feeling "pretty tipsy" and with his head spinning from the alcohol, Bickham returned to the living room, sat down on a couch, and laid his head back.

After some time passed, Bickham heard Gresham yelling, so he got off the couch and went to the bathroom. Preston, Wilson, Ellison, Prince, and two other people were standing behind him. He saw Doe passed out on the floor, her head leaning backwards over the bathtub, her shirt up with her breasts exposed, and her pants pulled down to her ankles. Bickham denied that was the condition she was in when he left the bathroom.

Gresham was telling Doe to get up, and there was a lot of commotion with people standing in the bathroom doorway. Gresham eventually stormed out of the bathroom, leaving Doe on the floor. Bickham, who had been standing by the bathroom sink, threw water on Doe's face, and Doe, whom Bickham described as "really intoxicated," said she wanted to go home. A few of the men helped her get dressed. Bickham had no memory of what happened after that, eventually waking up on the floor of his future mother-in-law's house.

Bickham testified that by Doe asking him if he was coming with her, she was essentially asking him to have sex with her. He assumed she was under the influence of alcohol at the time they went into the bathroom because she had been drinking alcohol, but he did not observe any signs of her intoxication and said she seemed "normal." He also claimed that he was intoxicated himself so would not have been a good judge.

**Antioch Police Officer Ernst**

Shortly after Doe woke up in the hospital, at around 11:00 a.m. the morning of August 5, she was interviewed by Antioch police officer Ernst. She told him she had gone to Wilson's apartment the prior evening, and Wilson, Prince, Ellison, Bickham, and

7

Preston were there.  Around 11:00 p.m., she went with Wilson and Preston to Bottom's Up Liquor to buy some cigarettes.  They returned to the apartment between 11:00 p.m. and 12:00 a.m., and she began to drink alcohol with Bickham.  She had a six-inch glass, and Bickham filled it halfway with rum.  She drank that, and then returned to the kitchen and poured another drink.  After she finished that drink, she sat on the couch, and Bickham sat next to her on the floor.  She and the men were talking about sex and her boyfriend.  The next thing Doe remembered was waking up in the hospital.

**Forensic Evidence**

Blood drawn from Doe at 3:23 p.m. on August 5 showed a blood alcohol concentration (BAC) of 0.09 percent.  Based on Doe's age and weight at the time of the incident and taking into consideration numerous variables, the state's expert criminologist testified that her BAC would have been between 0.23 and 0.65 percent at 1:15 a.m. that morning.  Assuming an average rate of alcohol elimination, her BAC would have been 0.30 percent at that time.  For someone of Doe's age, height, and weight, a 0.30 percent BAC would typically represent 10.4 to 11.2 drinks, give or take a drink.  At that BAC, some people may be unconscious and at near-lethal levels, while others may still be conscious.

The police searched the apartment on August 5.  The bathroom smelled like vomit, and there was a used condom in the garbage can and half of a Durex brand condom wrapper under the bathroom rug.

In the kitchen garbage can, there were five used condoms, three clear and two black.  Two had "substantial amounts" of seminal fluid still inside, one had a pink waxy substance on it that was consistent with lipstick, and one of the clear ones was torn. There were also Durex and Lifestyles Tuxedo Black brand condom wrappers, six whole wrappers and one half.  In a dresser in one of the bedrooms, there was an unused Durex condom.

DNA tests on a vaginal swab taken from Doe immediately following the assault identified semen from a single source that did not match the DNA profiles of Wilson, Ellison, or Prince.[4]

In 2007—five years after the incident—the Department of Justice notified the Contra Costa County Sheriff's Office that Bickham's DNA profile matched the profile developed from Doe's rape kit.

In 2009, it was discovered that the 2007 notice from the Department of Justice had been disregarded in error. Antioch police detective Danielle Joannides was assigned to reopen the case. She located Bickham in July 2009 and obtained a buccal swab from him, later obtaining a swab from Preston in 2011. The DNA profile developed from Bickham's swab matched the semen in Doe's vaginal swab and semen found on her underwear and sock, while Preston's DNA profile also matched semen found on Doe's underwear. One of the clear condoms in the kitchen garbage had Bickham's and Doe's DNA on one side and Preston's on the other. According to the criminalist who testified at trial, the findings were consistent with Bickham having unprotected sex with Doe, followed by Preston having sex with her using a condom.[5]

**Antioch Police Detective Vince Augusta**

Antioch police detective Vince Augusta was assigned as the lead investigator on the case. At trial, he generally described his investigation, including his interviews of Gresham, Prince, Wilson, and Ellison. He also testified to the efforts he made to locate defendants in the year following the assaults, efforts we detail below in connection with Bickham's motion to dismiss. He testified that because his efforts to locate defendants were unsuccessful, he suspended the case in August 2003. Detective Augusta described it as "pretty foolish" to have done so, testifying that in retrospect, he should have obtained a *Ramey*[6] warrant, which would have been entered into the California Law

---

[4] All three provided sexual assault kits and blood samples shortly after the assault.

[5] Another condom was found to have Ellison's DNA on one side and Doe's on the other.

[6] *People v. Ramey* (1976) 16 Cal.3d 263.

9

Enforcement Teletype System (CLETS), so when either defendant was stopped by a police officer, the officer would have been alerted to the existence of the warrant.

## PROCEDURAL BACKGROUND

On June 12, 2012—nearly 10 years after the assault—the Contra Costa County District Attorney filed a complaint charging Bickham, Preston, and Ellison with one count each of rape of an intoxicated person.[7] (Pen. Code, § 261, subd. (a)(3).) An information charging Bickham and Preston with the same counts followed on August 7.[8]

On October 9—with trial set to commence on October 15—Bickham filed a "motion to dismiss based upon a denial of due process and speedy trial right." The motion argued that the preaccusation delay violated his right to due process and a speedy trial because he was prejudiced by a loss of evidence, the unavailability of material witnesses or the diminution of their memory, and a lost opportunity for concurrent time. It was supported by eight exhibits and a declaration of investigator Dan Castori, discussed in detail below.

Preston filed a similar "motion to dismiss for violation of right to due process (speedy trial)," asserting essentially the same arguments. His motion was supported by a declaration of investigator Scott Whitney, also discussed below.[9]

On October 23, the People filed opposition to defendants' motions, contending defendants had not demonstrated they were prejudiced by the delay, but if the court found prejudice, the People's reasons for delay outweighed any prejudice defendants suffered.

On October 25, the court heard lengthy argument on the motions. The hearing was continued to November 5, and after further argument, the court denied the motions.

---

[7] The district attorney filed an initial complaint against Bickham on February 25, 2010. He was held to answer on August 3, 2011, and trial was set for June 18, 2012. The district attorney dismissed that case on June 13, 2012, having filed a new complaint under the current case number the day before.

[8] At the time of trial, there was still a warrant out for Ellison's arrest.

[9] Preston also filed a joinder in Bickham's arguments.

Testimony commenced on November 26.  Following the prosecution's presentation of evidence, defendants renewed their motions to dismiss, which the court again denied.

After six days of testimony, the jury found defendants each guilty of one count of rape of an intoxicated woman.  Bickham was sentenced to six years in state prison, Preston eight years.

Defendants timely appealed.

## DISCUSSION

### 1. The Preaccusation Delay Did Not Deprive Defendants of Their Right to Due Process

### A. Bickham's Motion and Supporting Evidence

As noted, Bickham moved to dismiss the charge against him on the ground that the preaccusation delay violated his rights to due process and a speedy trial because he was prejudiced by a loss of evidence, the unavailability of material witnesses or the diminution of their memory, and a lost opportunity for concurrent time.  Specifically, he asserted four claims of prejudice:  (1) the loss of Doe's cell phone and cell phone records, which "could have revealed text messages or phone calls that she made around the time of the incident, making it unlikely that she was passed out when the alleged assault occurred"; (2) the inability to test the exterior of the condoms and the condom wrappers found at the apartment for amylase, an enzyme that indicates the presence of saliva, which would have suggested a consensual encounter; (3) the unavailability of Ellison, Wilson, and Prince, all of whom supposedly gave statements favorable to the defense shortly after the incident; and (4) a lost opportunity to serve a concurrent sentence, since he served jail terms in 2005 and 2007.

Bickham's motion was supported by eight exhibits.  Much of what was contained in those exhibits is duplicative of the evidence introduced at trial (already summarized above), and the exhibits are, to a certain extent, duplicative of each other.  While we are loathe to be redundant, we find it necessary to describe Bickham's exhibits in detail,

11

repetitive as it may be, since they go to the very heart of defendants' primary argument on appeal. Thus, the exhibits were as follows:

### Exhibit A—Preliminary Police Report of Antioch Police Officer MacNiven

In a preliminary police report dated August 5, 2002, Antioch police officer MacNiven reported that he had been dispatched to the apartment at 3:03 a.m. on August 5, where he interviewed Gresham. She described the following events: At 8:00 p.m. the previous evening, she ran into Doe at Bottom's Up Liquor. Doe told her she was going to the apartment with Bickham, Preston, Ellison, and Wilson (referred to by Officer MacNiven as "the four suspects"). Gresham and Buckner arrived at the apartment at 1:00 a.m., and one of the men told her Doe had consumed six shots of rum. Gresham heard what sounded like Doe being sick and moaning in the bathroom, and by 1:15 a.m., she became alarmed and went to check on the noise. Bickham was inside the bathroom and tried to lock the door to prevent Gresham from entering. She forced her way in, and Bickham quickly exited. Gresham found Doe passed out, leaning over the side of the bathtub with her legs spread open. She was completely unclothed and had what Gresham believed to be semen dripping from her inner thigh.

Gresham went into the living room, where she saw Bickham push Buckner onto the couch. He then grabbed Gresham by the arms in an effort to keep her from leaving. When one of the other men told him, "Just let them go," she and Buckner were able to leave the apartment.

At 2:20 a.m., approximately 40 minutes after they had left, Gresham, Buckner, and another friend returned to the apartment. Doe's car, which had been parked in the lot near the apartment when they left, was no longer there.

Officer MacNiven classified the incident as "rape; victim asleep unconscious, unable to resist due to alcohol or controlled substance" and identified defendants, Ellison, Wilson, and Prince as the suspects.

### Exhibit B—Supplemental Report of Antioch Police Officer Rob Cecchini

At 4:54 a.m. on August 5, Officer Cecchini was dispatched to Doe's house, where he found Doe, her family, multiple emergency responders, Wilson, Ellison, and Prince.

12

He spoke to the three men at the same time, reporting their account of the incident as follows:

Wilson, Ellison, and Prince were at the apartment when Doe, Bickham, and Preston arrived around 10:00 pm. They left around 10:30 p.m. and returned 15 minutes later with large bottles of alcohol. From the time they returned until about 12:30 a.m. the following morning, the three of them drank alcohol. At 12:30 a.m., Doe said she was going to the bathroom. While she was in there, Bickham walked to the back of the apartment, followed by Preston a few minutes later.

One of them called Gresham to tell her to pick up Doe because she was "really drunk." She arrived about 20 minutes after Doe had gone into the bathroom, and Wilson directed her to the bathroom. As Gresham walked down the hallway, Wilson, Ellison, and Prince were walking behind her. They saw Bickham and Preston leave the bathroom smiling and laughing. Gresham opened the door, and Doe was passed out in the bathroom, face up on the edge of the bathtub with one leg on the toilet and the other hanging over the edge of the tub. Her pants were pulled down, her shirt was pulled up, and, "The room smelled like sex."

Gresham became very upset and stormed out of the apartment, saying she was going to call the police. Defendants became concerned about what might happen to them, so they dressed Doe, and at 12:45 a.m., carried her to her car and drove away. When they returned around 2:00 a.m., Bickham said they had dropped her off by her house. Wilson became upset because he was concerned for Doe's safety, so Ellison, Prince, and he all left to find her. They drove around until 4:00 a.m., when they finally found her car, with her unconscious in the driver's seat. After trying for 30 minutes to wake her, they drove her home.

Wilson, Ellison, and Prince agreed to follow Officer Cecchini to the Antioch Police Department, where they were arrested on suspicion of rape.

### *Exhibit C—Supplemental Report of Antioch Police Detective Ernst*

Detective Ernst interviewed Doe at approximately 12:15 p.m. on August 5, when she gave the following statement: Early the prior evening, Doe went over to Wilson's

apartment, where Wilson, Prince, Ellison, Bickham, and Preston were all hanging out. Around 11:00 p.m., she, Wilson, and Preston went to Bottom's Up Liquor to get cigarettes and then returned to the apartment between 11:00 p.m. and midnight. She and Bickham started to drink rum, with Bickham filling her six-inch glass halfway full. She drank that, followed by a second glass. She then went into the living room and sat down on the couch, with Bickham on the floor next to her. She started to talk to Bickham and Wilson about sex and her boyfriend, and the next thing she knew, she woke up in the hospital. She did not consent to having sex with anyone at the apartment.

### Exhibit D—Supplemental Report of Detective Vince Augusta, Lead Investigator

*Gresham's statement*: At 9:15 a.m. on August 5, Detective Augusta interviewed Gresham, who provided the following account:

Around 8:00 p.m. the prior evening, Gresham and Buckner ran into Doe at the Bottom's Up Liquor store in Antioch. Doe was with Wilson and Preston and was in good spirits.

Around 1:15 a.m. that morning, Gresham and Buckner went to Ellison's apartment. A man Gresham did not know told her Doe had drunk six shots of alcohol.

Gresham saw Wilson outside the bathroom, laughing as he was trying to open the door with a butter knife. Bickham finally opened the door from the inside, and Gresham saw that Doe and Preston were also inside. Gresham thought Bickham was the first one in the bathroom and that when he came out, Preston and Ellison went in. She also saw Ellison and Wilson go into and out of the bathroom, observing that their pants were slightly down when they came out and that Ellison was pulling his pants up. Ellison told her that he tried to help Doe by making her throw up, but Bickham was having sex with her while she was passed out, which made it difficult. Gresham also told Detective Augusta that when she finally forced her way into the bathroom, Preston ran out. She found Doe passed out with no pants on and semen on her legs.

Gresham was unable to awaken Doe, so she tried to leave to get help but Bickham tried to stop her, telling her, "Nobody is going anywhere." She eventually forced her way past him and went for help.

14

Gresham and Buckner returned to the apartment around 3:00 a.m., and only Ellison and Wilson were there. They said that Doe had left with Bickham and that they found her in her car parked on the side of the road.

Detective Augusta's report also summarized interviews he conducted with Wilson, Ellison, and Prince individually, as follows:

*Wilson's statement*: Wilson lived at the apartment with his mother and Ellison (his cousin). On the evening of August 4, he was at his apartment with Ellison and Prince. Doe, Bickham, and Preston arrived around 10:00 p.m., with Doe in her usual "good mood." Doe and Bickham left to go to the store, returning about an hour later with a bottle of rum. Doe and Bickham started "chugging" the alcohol, and Doe began to slur her speech.

Around 12:40 a.m., Bickham tried to help Doe get up to use the bathroom, but Doe refused his help and went by herself. About a minute later, Bickham and Preston followed her into the bathroom.

Ellison called Gresham and told her to come get Doe, who was drunk and in no condition to drive. Gresham arrived sometime between 1:00 a.m. and 2:00 a.m. She walked towards the bathroom, and Wilson went with her to try to open the door with a butter knife. Bickham and Preston came out of the bathroom at about the same time. Doe was undressed and passed out on the edge of the bathtub. Wilson and Gresham dressed Doe and brought her out to the living room. Gresham then left the apartment.

Around 1:40 a.m., Bickham left the apartment with Doe and later returned alone. Wilson asked if he had taken Doe home, and Bickham responded that he had left her in her car at a construction site. Ellison, Prince, and Wilson all left the apartment to look for Doe, finally finding her in her car around 4:15 a.m. After unsuccessfully trying for 30 minutes to wake her, they drove her home. Doe's family was at the house, and the police arrived shortly after.

Wilson denied having had sex with Doe, claiming he did not have that type of relationship with her. When asked about used condoms found in the kitchen garbage and the bathroom, Wilson told the detective that the condoms in the kitchen were from

15

previous dates he had with other women. He denied any knowledge of who used the condom found in the bathroom.

*Prince's statement*: Prince arrived at Ellison's apartment around 5:30 p.m. that evening. At some point, Bickham, Doe, Gresham, and Buckner left the apartment to go buy alcohol, and Bickham and Doe returned with a bottle of rum. When they first arrived back at the apartment, Bickham and Doe went into the bathroom together. When they came out, they began drinking the rum. They were drinking shots one after another out of regular drinking glasses.

After Doe drank her fourth glass of rum, she was really out of it. She was talking on the phone as if someone was on the other end, even though no one was there. She drank two more glasses, telling Bickham that she was not an amateur drinker and could hold her own. After her sixth glass of rum, she began to "spit up." Prince offered to take her to the bathroom, but she declined, saying she was "cool."

A few minutes later, Doe began to "spit up" again. Prince thought she was going to throw up so he again offered to take her to the bathroom. She told him she was fine but that she had to go "pee" and got up and walked to the bathroom. Bickham followed her into the bathroom. Prince heard conversation coming from the bathroom and then moaning, as if Doe and Bickham were having sex.

Gresham and Buckner arrived at the apartment, and Prince told them Doe had drunk about six or seven shots of rum. One of the women went into the bathroom to get Doe.

While Doe's friends were there, Bickham walked out of the bathroom, smiling, and Prince assumed he had had sex with Doe. He also saw Preston walk out of the bathroom, laughing.

Prince walked over to the bathroom and saw Doe "laid out" on the floor with her head leaning over the bathtub. Her shirt was still on, but her pants and underpants were pulled down and her legs were spread open with semen on her thigh. He tried to wake her up by putting water on her face, but she would not respond.

Gresham and Buckner were telling Bickham they wanted to leave, but he "flip[ped] out," screaming at everyone not to leave the apartment. He finally let the women leave.

Bickham dressed Doe, dragged her outside to her car, and drove off. He later returned, telling everyone he left her somewhere in Pittsburg and she would know how to get home. Prince did not feel right about how Bickham left Doe alone, so he, Ellison, and Wilson drove around looking for her. When they finally found her, they drove her home.

*Ellison's statement*: Ellison and Wilson lived in an apartment in Antioch with Wilson's mother. On the evening of August 4, he, Wilson, Prince and another friend were hanging out at the apartment. Later on, Bickham, Preston, and Doe came over. They were already slightly intoxicated when they arrived, which he knew because Doe was not her usual self and she told him she was already drunk.

Around 10:00 p.m., Bickham, Preston, and Doe left the apartment, returning about an hour later with a large bottle of rum. Bickham and Doe were the only ones who drank it, Bickham from the bottle and Doe from a glass. He did not know how much she drank, but it was a lot. After a while, he told her to stop drinking, and he called Gresham to tell her to come get Doe because she was not going to be able to drive home.

As everyone was watching a movie, Doe stood up, announced that she had to go to the bathroom, and walked to the bathroom. About 10 seconds later, Bickham followed her. After about 15 or 20 minutes, Bickham came out of the bathroom laughing, and Preston went in. Preston was in the bathroom for about three minutes.

Figuring they had all been in the bathroom for a long time and after hearing doors slamming, Ellison went to the bathroom and turned the light on. He saw Doe lying with her bottom against the bathtub and one leg draped over the toilet. Her pants had been pulled down to just above her knees. He and Prince pulled her pants back up.

Ellison asked Bickham what he was doing. Bickham was drunk and started going crazy, yelling that he was going to take Doe home.

Gresham arrived, saw Doe in the bathroom, became very upset, and left.

17

Bickham left with Doe, later returning and telling everyone that he had dropped her off close to her house. Ellison, Prince, and Wilson left to find Doe, spending practically the whole night looking for her. When they finally found her, they took her home.

Ellison denied any knowledge regarding the used condoms found at the apartment, speculating that Bickham or Preston might have used one. He had earlier seen a condom in Preston's pocket, and Preston still had it with him when he went into the bathroom. Ellison did not know anything about the condoms found in the kitchen garbage can.

*Efforts to Locate Defendants*

In his supplemental report, Detective Augusta described his efforts to locate defendants in the year following the assault, which efforts were these:

On August 7, 2002, Detective Augusta spoke with Doe's mother, who provided a phone number for Asia Perry, a supposed relative of Preston's. That same day, Detective Augusta went to the last known address for Bickham. No one was home, and the detective left one of his business cards.

On August 8, Detective Augusta contacted Perry, who advised that Preston was her ex-boyfriend. She provided a possible telephone number and address for him, but the number was disconnected. That same day, the detective received a telephone call from a Reverend Tinsley, Bickham's surrogate parent. The Reverend last spoke with Bickham a week earlier and did not want to have any contact with him, although he would tell Bickham to contact the detective if he saw him.

On August 15, Doe contacted Detective Augusta to report that she had heard Bickham and Preston had been seen together at the El Pueblo apartments. She called him again on January 6, 2003 to tell him that she had seen Bickham driving around, although she was unable to provide any details such as a license plate number. Doe called him a third time on February 13, 2003 to report that she had recently seen Bickham and had written down his license plate number. The detective found that the car was registered to Bickham. One month later, he visited the registered address of the car. An elderly

18

woman at the residence—Bickham's grandmother—told him she had not seen Bickham for about a month and did not know where he was staying.

On June 5, 2003, Detective Augusta again spoke with Perry, who had not seen Bickham but had heard he had been seen in the Antioch/Pittsburg area. She provided a possible name of a friend of Bickham's, but the detective was unable to locate anyone by that name.

That same day, Detective Augusta went to Wilson's house to find out if he knew where to find Bickham. Wilson was not there so he left a business card. On June 16, Detective Augusta spoke with Wilson, who told him he had not had any contact with Bickham since the August 2002 incident and did not know where to find him.

In the later part of June 2003, Detective Augusta twice contacted Bickham's grandmother, who told him Bickham had not been at the house for quite some time. Around that same time, he contacted the Pittsburg and Vallejo Police Departments but was unable to obtain any information regarding Bickham's possible whereabouts. He obtained the names of possible employers from the Social Security Administration, but the information did not pan out.

On August 5, 2003, Detective Augusta made one final attempt to locate Bickham through potential employers, but this, too, proved unsuccessful. He noted that "without any biological evidence (saliva sample) from Bickham to compare from evidence collected from [Doe], it is impossible to determine who[] might have assaulted" her. He concluded his supplemental report with a notation that he was suspending the case.

### Exhibit E—Letter from the State of California Department of Justice

In a letter dated June 15, 2007, the State of California Department of Justice informed the Contra Costa County Sheriff's Office that the DNA profile developed from Doe's rape kit matched Bickham's DNA profile.

### Exhibit F—Supplemental Report of Antioch Police Officer McElroy

Officer McElroy submitted a supplemental report (date unknown) stating that the case was assigned to him on June 27, 2007 for follow up in light of the notice from the Department of Justice identifying Bickham as the donor of semen found in Doe's rape

19

kit. Officer McElroy noted that upon reviewing the case in July 2007, he had determined that the case had previously been adjudicated, and he thus took no further action.

### Exhibit G—Bickham's Rap Sheet

Bickham's rap sheet showed that between 2002 and 2009, he had been arrested or stopped by police at least 12 times: once in June 2003, five times in 2004, three times in 2005, once in 2007, and twice in 2008. He was convicted of criminal offenses on three separate occasions and placed on three grants of probation.

### Exhibit H—Supplemental Report of Antioch Police Detective Joannides

In a September 20, 2011 supplemental report, Antioch police detective Joannides reported that she had reopened the investigation into Doe's sexual assault. Because a DNA analysis identified Ellison's DNA on a condom that also contained Doe's DNA, Detective Joannides had located Ellison in Sacramento on September 13 and obtained the following statement:

Bickham had recently called Ellison and told him "a lot of stuff was going on" and he was going to court because of the incident. Ellison was not friends with Bickham, the two never spoke, and he did not know how Bickham got his number. Bickham told him they needed to get together and come up with a story. Ellison told him, "I don't have no story," but that he would talk to an attorney. During the call, Bickham told him everyone who had been at the apartment the night of the incident would be contacted and they needed to get together and come up with a story. Ellison again told Bickham, "I don't have no story." He interpreted the telephone call as Bickham trying to get someone to help him.

Ellison did not remember Bickham's cousin's name and could not recall who was involved in the incident because of how long ago it occurred. He knew the victim, although he did not really remember her. He did remember that at the time, he lived in an apartment with his cousin, Wilson, but the two had not kept in touch and he believed Wilson lived in another state. Prince was a friend of his who was visiting the day of the incident, but they had not kept in touch. He had, in fact, lost touch with everyone involved shortly after the incident.

20

When Detective Joannides asked Ellison about some of the details related to the incident, Ellison responded that he "really couldn't remember nothing because its [*sic*] been so long and I don't remember anything." Ellison denied that he had a relationship with Doe, stating, "No, nah . . . it wasn't really like that, she was just coming to visit the home." He did not recall if anyone had a sexual relationship with Doe. Asked if he had sex with Doe, he responded, "No, no . . . Not that I can remember . . . it's been too long, I don't, I don't, remember anything."

Ellison did, however, relate certain details regarding what happened on August 4 and 5. He stated that when the "incident" occurred, they asked Bickham what had happened, because Doe was unconscious in the bathroom. Ellison described Doe as "very responsive" with him and everyone else before she and Bickham went into the bathroom.

According to Ellison, after Bickham walked out of the bathroom, Bickham had nothing to say and left the apartment. Preston had left the apartment shortly before that, so only Ellison and Wilson remained. Bickham and Preston returned, and Ellison told them they needed to take to Doe to her mother's house or call the police, and they ended up dropping her off somewhere. Ellison and Wilson decided they needed to find Doe, so they drove around until they found her car and then took her home.

When asked if there was any reason his DNA would have been found anywhere on Doe, Ellison responded, "No." Asked if he had ever had any sexual contact with Doe, Ellison said there was a possibility he may have—he did not remember—but not that night.

Ellison expressed a willingness to cooperate with the investigation, because he felt what occurred was wrong and that Bickham and Preston had something to do with it.

***Declaration of Dan Castori***

In support of his motion, Bickham also filed a declaration of investigator Dan Castori. Castori testified that he was assigned the task of locating and interviewing Prince. Through a public records search, he located two possible telephone numbers and a Brooklyn, New York address for him. On September 18, 2012, he spoke with Prince by

21

telephone. Prince told Castori that he lived in Manhattan but would not provide a specific address. When asked about the August 2002 incident, Prince responded that it occurred a "very long time ago" and he did not want to be involved in the matter, declining further comment and terminating the conversation.

**B. Preston's Motion and Supporting Evidence**

Preston filed a "motion to dismiss for violation of right to due process (speedy trial)," similarly arguing that he was prejudiced by the loss of Doe's cell phone and cell phone records, the inability to test the condoms and condom wrappers for the presence of amylase, and the unavailability of Prince, Wilson, and Ellison. It was supported only by a declaration of private investigator Scott Whitney who, as pertinent here, testified as follows:

Whitney determined that neither Wilson nor Ellison still lived at the Antioch apartment, having moved by March 2003 at the latest. He located nine addresses potentially associated with Wilson. He visited five Bay Area addresses on various days in September 2012, and eliminated four of them as viable addresses for Wilson. As to the fifth address, he was unable to contact a resident on either of two visits and therefore did not determine whether the address was in fact associated with Wilson. He located a possible sixth address in Antioch, but did not visit it.

Whitney also located two out-of-state addresses used by Wilson in 2012, but he apparently made no attempts to pursue these addresses.

Whitney also did a record search in Solano and Contra Costa counties and found multiple criminal cases involving an Alphonso Wilson, but determined they did not match the Alphonso Wilson he was looking for.

As to Prince, Whitney located two addresses that Prince used around the time of the assault. Both addresses listed new residents, and he did not visit either one. He located two possible Oakland addresses. A visit to one of them confirmed that someone else lived there. He visited the other address twice in September 2012, but did not determine whether Prince was associated with the address.

Whitney also located a Michigan address that Prince had used as of July 2012. He noted that Prince obtained a Michigan driver's license and registered as a Democrat in Michigan, both in 2004.

Finally, Whitney noted that Prince was listed as a registered Democrat in New York City in 2008 and voted there in November 2008.

As to Ellison, Whitney attempted to contact him at the address where Detective Joannides located him in 2011. There was no answer at the residence, and Whitney was unable to determine if he still lived there. He eliminated an alternative address in Sacramento because someone unassociated with Ellison lived there. Whitney located an address near the California/Oregon border used by Ellison in July 2012 but did not visit it.

Whitney also located an address for the woman who lived with Ellison in 2011 when he was contacted by Detective Joannides. There was no indication that he visited that address or attempted to contact her, despite a records search suggesting that she previously filed a paternity case against Ellison.

## C. Hearing on Defendants' Motions

On October 25, 2012, defendants' motions came on for hearing. At the hearing, counsel for Bickham filed a supplemental declaration of Dan Castori, in which Castori further testified to the public records search he did for Prince. Bickham's counsel also called Castori to testify concerning his efforts to locate Prince. According to Castori, he began his attempts to locate Prince on September 18, 2012. He ran a database search and located an address in Brooklyn, New York and two telephone numbers. He phoned one of the numbers, and someone who identified himself as Isaac Prince answered. Prince told him he had no helpful information, did not wish to be interviewed, and hung up. The other number was associated with a relative of Prince's in Oakland but was disconnected.

Castori also testified concerning efforts he made to locate Ellison. He testified that in January 2012 he ran a public records search that returned four potential addresses for Ellison, all in Sacramento. He visited all four addresses, found no one home at any of

them, left his business card at each one, but never received any telephone calls.  He also located four potential telephone numbers but they were all disconnected.

Lengthy argument lasting most of the day followed, after which the court ruled that defendants had not demonstrated due diligence in attempting to locate Wilson and Ellison, and thus had not established their unavailability.  At the request of defense counsel, however, the court continued the matter to November 5 to afford defendants additional time to locate Prince.

On November 5, the motions came on for further hearing.  Counsel for Bickham informed the court that he had retained an investigator in New York to attempt to locate Prince, but the investigator's efforts were interrupted by Hurricane Sandy.  The investigator was going to visit three potential addresses for Prince that day.  The investigator had received a telephone call from Prince, who would not confirm his current address although he represented that the Brooklyn address was no longer valid.

After further argument, counsel for defendants requested that the court continue the trial date so the efforts to locate Prince could continue, submitting that Prince's statement to Detective Augusta in 2002 made his presence at trial absolutely necessary.  The court denied the request, ruling that defendants had until that day to demonstrate Prince's unavailability but that they had not done so.  The court ultimately found that defendants failed to demonstrate prejudice on any of the grounds urged in their motions and, having found no prejudice, it declined to weigh the prosecutor's reasons for the preaccusation delay.  It therefore denied defendants' motions, subject to reconsideration based on an additional showing regarding Prince's availability at the time of trial.

### D.  The Law Applicable to a Motion to Dismiss Based on Preaccusation Delay and Standard of Review

The law governing a claimed due process violation based on a delay in prosecution is well established.  As the California Supreme Court has summarized:  "An unreasonable delay between the time an offense is committed and an accusatory pleading is filed may violate a defendant's right to a fair trial and due process of law under article I, section 15, of the California Constitution and the Fifth and Fourteenth Amendments to

24

the United States Constitution.  [Citation.]  In evaluating a claim of precomplaint delay, 'any prejudice to the defendant resulting from the delay must be weighed against justification for the delay.'  [Citation.]  'In the balancing process, the defendant has the *initial* burden of showing some prejudice before the prosecution is required to offer any reason for the delay [citations].  The showing of prejudice requires some evidence and cannot be presumed.  [Citations.]' "  (*People v. Morris* (1988) 46 Cal.3d 1, 37, disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543–544, fn. 5; accord, *People v. Catlin* (2001) 26 Cal.4th 81, 107; *Scherling v. Superior Court* (1978) 22 Cal.3d 493, 504–507.)  The evaluation of a claim of precomplaint delay has been described as a three-step process:  "First, the defendant must show he has been prejudiced by the delay.  Second, the burden then shifts to the prosecution to justify the delay.  Third, the court balances the harm against the justification."  (*People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 911 (*Dunn-Gonzalez*); accord, *People v. Mirenda* (2009) 174 Cal.App.4th 1313, 1328.)

Prejudice may be shown by a loss of material witnesses due to lapse of time or loss of evidence because of fading memory attributable to the delay.  (*People v. Morris, supra,* 46 Cal.3d at p. 37; *Dunn-Gonzales, supra,* 47 Cal.App.4th at p. 911.)  Prejudice can also result from the loss or destruction of material evidence.  (*Serna v. Superior Court* (1985) 40 Cal.3d 239, 251.)  "The overarching theme is that the loss of such evidence, especially where the defendant or victims cannot independently recall details of the crime, makes it difficult or impossible for the defendant to prepare a defense thus showing prejudice."  (*People v. Mirenda, supra,* 174 Cal.App.4th at p. 1328.)  The defendant must establish actual prejudice shown by particular facts, not bare conclusory statements.  (*Crockett v. Superior Court* (1975) 14 Cal.3d 433, 442.)  Where defendant fails to demonstrate prejudice, "the court need not inquire into the justification for the delay since there is nothing to 'weigh' such justification against."  (*Dunn-Gonzales, supra,* 47 Cal.App.4th at p. 911.)  Even a minimal showing of prejudice, however,

requires the prosecution to explain the reasons for the delay.  (*Craft v. Superior Court* (2006) 140 Cal.App.4th 1533, 1540–1541.)[10]

We review the trial court's ruling on a motion to dismiss for abuse of discretion, deferring to any underlying factual findings made by the court if they are supported by substantial evidence.  (*People v. Jones* (2013) 57 Cal.4th 899, 922; *People v. Cowan* (2010) 50 Cal.4th 401, 431; *People v Alexander* (2010) 49 Cal.4th 846, 874; *People v. Mirenda, supra,* 174 Cal.App.4th at p. 1328.)  Whether defendant was prejudiced by a preaccusation delay is a question of fact to be determined by the trial court.  (*People v. Mirenda, supra,* 174 Cal.App.4th at p. 1328; *Dunn-Gonzalez, supra,* 47 Cal.App.4th at pp. 911–912.)

**E.  Substantial Evidence Supports the Trial Court's Finding That Defendants Were Not Prejudiced by the Preaccusation Delay**

**1.  Unavailability of Wilson, Prince, and Ellison**

Defendants challenge the trial court's finding that they had not demonstrated they were prejudiced by the absence of testimony from Wilson, Prince, and Ellison.  Bickham contends that these witnesses were critical to his defense, as "the case really came down to what [they] could say," and they previously gave statements to the police supporting his claim that the sex with Doe was consensual.  Preston asserts that due to the delay in being charged, he was unable to locate these witnesses, each of whom, he contends, "could have provided valuable information that reflected directly on Doe's level of intoxication and that could have led the jury to reasonably infer she was less intoxicated than the expert estimated, by showing that some of the expert's assumptions about how the events unfolded were inaccurate."

---

[10] Bickham also asserts a violation of his right to a speedy trial. Under California law, that right attaches upon the filing of an indictment or information and protects against post-accusation delay.  (*Scherling v. Superior Court, supra,* 22 Cal.3d at p. 504; *People v. Conrad* (2006) 145 Cal.App.4th 1175, 1183.)  His right to a speedy trial was not implicated here, as the complaint was filed on June 12, 2012, the information on August 7, 2012, defendants waived time for trial until November 6, 2012, and they were tried in November and December 2012.

26

Evidence Code section 240 identifies six circumstances under which a witness may be deemed "unavailable." One such circumstance is when the witness is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (§ 240, subd. (a)(5).) Despite their claimed "diligent efforts" to locate Wilson, Prince, and Ellison, the trial court found defendants had not established their unavailability. This finding was supported by substantial evidence.

As to Wilson, Bickham's investigator made no attempts to locate him whatsoever. Preston's investigator Whitney eliminated four Bay Area addresses as bad addresses for Wilson. He visited a fifth Bay Area address twice and an Elk Grove address once, not finding anyone home at either address and conducting no follow-up. He located potential addresses in Antioch, Texas, and Colorado, but made no attempts to determine if any of these addresses could lead to Wilson's whereabouts. At best, this was a half-hearted effort to locate Wilson.

Turning to Ellison, Bickham had contact information for him as of 2011, when Bickham was facing the same charge under a different docket number and telephoned him in an attempt to influence his account of the assault. But it was not until September 24, 2012 that Whitney attempted to contact him at the Sacramento address where Detective Joannides had located him in 2011. No one answered during that one visit, and Whitney made no follow up efforts to determine if Ellison was still associated with that address. Whitney located another potential address near the California/Oregon border that Ellison used in July 2012, but he did not visit it even once. And he located an address for the woman with whom Ellison lived in 2011, but there was no indication he followed up on that potential lead.

Bickham's investigator made similarly feeble attempts to locate Ellison. In January 2012, he ran a public records search that returned four potential addresses for Ellison, all in Sacramento. He visited these, found no one home at any of them, left his business card at each one, and did no follow-up. He located four potential telephone numbers but they were all disconnected. That is it. Hardly the "diligent efforts"

27

defendants claim them to be. In light of this record, we conclude that the court's finding that defendants failed to establish Wilson's and Ellison's unavailability was supported by substantial evidence.

Prince presented a somewhat different situation, since Bickham's investigator actually made telephone contact with him. Nevertheless, the court's determination that defendants failed to demonstrate Prince's unavailability was likewise supported by substantial evidence. Despite that the trial was set to commence on October 15, 2012, Castori did not undertake efforts to locate Prince until September 18. And those efforts consisted of little more than tracking him to a telephone number in New York, and then ceasing any further efforts when Prince said he did not want to be involved. The trial court could easily have found a lack of due diligence at that point, but instead generously afforded defendants additional time to locate him. In that time, Bickham's counsel retained a New York investigator who located three potential New York addresses for Prince but was unable to visit them before the continued hearing because of Hurricane Sandy. As the trial court noted at the continued hearing, had defendants made timely and diligent efforts to locate Prince, there was an indication he would have been available for trial. And while the defense was willing to prepare an interstate subpoena to ensure Prince's attendance at trial, it failed to do so in a timely fashion.

Perhaps more significantly, even if defendants had demonstrated the unavailability of Wilson, Ellison, or Prince, their claim of prejudice due to the absence of these witnesses was not supported by the record. Defendants were found guilty of rape of an intoxicated woman, the essence of which was that Doe was so intoxicated she lacked the capacity to give legally cognizable consent to having sexual intercourse. (*People v. Giardino* (2000) 82 Cal.App.4th 454, 460, 462.) Thus, the critical question here was whether Doe's level of intoxication and the resulting mental impairment was so great that she was incapable of exercising reasonable judgment. (*Id.* at pp. 466–467.) Despite defendants' claim that "all three gave statements to police that supported the defense theory of the case that consensual sex occurred," the statements these three witnesses gave near the time of the assault were uniformly unfavorable to defendants.

28

When Officer Cecceroni spoke to Wilson, Ellison, and Prince jointly the morning of the rape, they told him that around 10:30 p.m. the prior evening, Doe, Bickham, and Preston went to a liquor store, returning 15 minutes later with large bottles of alcohol. From then until 12:30 a.m., they drank alcohol. At 12:30 a.m., Doe said she was going to the bathroom, and Bickham followed her to the back of the apartment, with Preston following a few minutes later. Ellison called Gresham to have her pick up Doe, who was "really drunk." Gresham arrived about 20 minutes after Doe had gone into the bathroom, and Wilson directed her to the bathroom. They saw Bickham and Preston leave the bathroom, and Gresham opened the bathroom door to find Doe passed out inside. Nothing in this joint description of the assault aids defendants' claim that Doe had the capacity to consent to sexual intercourse with them. And their individual statements to Detective Augusta were equally as damaging.

In his statement to Detective Augusta, Wilson told the detective that after 10:00 p.m., Doe and Bickham went to the liquor store, returning around 11:00 p.m. with a bottle of rum, which they then started "chugging." Doe began to slur her words. Around 12:40 a.m., Bickham tried to help Doe to the bathroom, but she refused his help and went by herself, with Bickham and Preston following about a minute later. Ellison called Gresham and told her to come get Doe because she was drunk. After Gresham arrived sometime between 1:00 a.m. and 2:00 a.m., she walked over to the bathroom, and Ellison tried to open the door with a knife. Bickham and Preston came out of the bathroom together, and Doe was undressed and passed out inside.

Ellison gave Detective Augusta a similarly damning account. According to him, Doe was already drunk when she arrived at the apartment. Around 10:00 p.m., she went to a liquor store with Bickham and Preston, returning about an hour later with a large bottle of rum. Bickham and Doe were the only ones who drank it, and while Ellison did not know how much Doe drank, he knew it was a lot. After a while he told her to stop drinking, and he called Gresham to come get her. At some point, Doe went to the bathroom, followed 10 seconds later by Bickham. He came out laughing about 15 or 20 minutes later, and Preston went in for about three minutes. After hearing doors

29

slamming, Ellison went to the bathroom, where he found Doe passed out and partially undressed. Nothing in these statements to Detective Augusta suggests Doe had the capacity to consent—indeed, they suggest the contrary.

Nor did Ellison's already damaging account become more favorable over time. When he was interviewed by Detective Joannides in 2011, he related that when the "incident" occurred, he asked Bickham what happened because Doe was unconscious in the bathroom. And he expressed a willingness to cooperate because he felt what occurred was wrong and that defendants had something to do with it. Despite this, Preston claims Ellison would have actually helped their case because in his interview with Detective Joannides, he described Doe as "very responsive" with him and everyone else before she and Bickham went into the bathroom, which suggests she was not too intoxicated to consent to intercourse. But this single, ambiguous characterization of Doe's behavior does not support defendants' prejudice claim. Ellison did not provide a timeframe for when Doe was purportedly "very responsive," i.e., whether this was *immediately* before she went into the bathroom or at some earlier point in the evening. Nor did he explain what he meant by "very responsive," i.e., whether he meant she was responsive as in conscious or as in flirtatious or as in something altogether different. And Preston's contention that Ellison describing Doe as "very responsive" meant she had the capacity to consent contradicts Ellison's express statement to Detective Augusta that Doe was so intoxicated he told her to stop drinking.

Lastly, Prince's version of events was no more helpful to the defense. According to him, Doe, Bickham, Gresham, and Buckner left the apartment, and Bickham and Doe returned with a bottle of rum. They went into the bathroom together and then came out and began drinking shots of rum one right after another out of regular drinking glasses, with Doe drinking six or seven glasses herself. By the fourth glass, she was really out of it, and after her sixth glass of rum, she began to "spit up." A few minutes later, she began to "spit up" again and said she was fine but that she had to go to the bathroom. She walked to the bathroom, and Bickham followed her. Prince heard conversation and moaning coming from the bathroom. Gresham and Buckner arrived, and one of them

30

walked over to the bathroom to get Doe. While the women were there, Prince saw Bickham walk out of the bathroom, smiling. He also saw Preston walk out of the bathroom, laughing. Prince then walked over to the bathroom and saw Doe "laid out" on the floor. Again, Prince's description of Doe as being really out of it, "spit[ting] up," and on the verge of vomiting directly undermines defendants' claim that she had the capacity to consent.

Ignoring all this, defendants contend that these statements were in fact helpful to their defense because they suggest Doe drank a large quantity of alcohol in a short period of time such that she had yet to absorb it at the time of the assault, making her BAC lower than suggested by the People's expert. They theorize that the timeline of the evening was critical to their defense because if she had started drinking earlier in the evening—as Doe told Officer Ernst the day of the assault and as consistent with the timeline Gresham provided at trial—her BAC would have been higher than it would have been if she had quickly consumed a large amount of alcohol just prior to the assault—as these three witnesses described to the police. The latter version, they posit, would support their claim that Doe was not so intoxicated that she lacked the capacity to consent to sexual intercourse with them. But, according to these three witnesses, Doe started drinking around 10:30 or 11:00 p.m., and the evidence indicated that the assault occurred around 1:15 a.m.—at least two hours later, certainly enough time for Doe to absorb sufficient alcohol to render her incapable of consenting. And defendants' timeline theory is also contradicted by the very descriptions these witnesses provided to the police: that Doe was highly intoxicated at the time she went into the bathroom and was unconscious after defendants left the bathroom.

Finally, Preston contends that Prince's statement was particularly critical because he told Detective Augusta that Doe and Bickham went into the bathroom soon after they returned from the liquor store, while Doe was still sober. He also saw Preston go into the bathroom, although, according to Preston, his statement was unclear as to when that happened. Prince also told the detective that after Doe began to "spit up" and walked towards the bathroom, he saw Bickham follow after her and not leave the bathroom until

31

after Gresham arrived. According to Preston, this suggests that he had sex with Doe in between the two times Bickham had sex with her, which must have been before Doe had consumed a lot of alcohol and before she started to "spit up." But Prince was not in fact unclear in when he saw Preston leave the bathroom: in providing Detective Augusta a chronological report of what he witnessed, he described seeing Bickham, who was smiling, and then Preston, who was laughing, walk out of the bathroom, leaving Doe passed out inside.

In sum, the record contains substantial evidence supporting the trial court's findings that defendants had not established the unavailability of Wilson, Ellison, and Prince, and that defendants were not prejudiced by the absence of their testimony.

### 2. Loss of Doe's Cell Phone and Cell Phone Records

Bickham also complains he was prejudiced by the loss of Doe's cell phone and cell phone records, which deprived him of the opportunity to determine if she telephoned or texted during the relevant time period. The evidence concerning Doe's telephone usage consisted of this: Doe testified that early on in the evening, she went outside and was talking on her telephone, and Prince told the police that when Doe was already drunk she claimed to be talking on the phone, although there was no one on the other end. Given that there was no evidence she made calls from her cell phone or sent text messages during the time she was drinking alcohol and leading up to the assault, the trial court's finding that defendants were not prejudiced by the lack of phone records was supported by substantial evidence.

Additionally, Gresham testified concerning the inappropriate messages Doe left on her answering machine. According to Doe, she made these calls from the apartment telephone earlier on in the evening. Given that she was already intoxicated when she left the messages for Gresham, evidence of phone calls or text messages subsequent to Doe's calls to Gresham would likely have been incriminating, not exonerating.

### 3. Amylase on Condoms and Condom Wrappers

Defendants also argued below that the passage of time made it impossible for them to test the condoms and condom wrappers for amylase, an enzyme that indicates the

presence of saliva. According to defendants, saliva on the condom or wrapper would have indicated a consensual encounter, since it would have suggested that Doe engaged in oral sex or used her mouth to open the wrapper. Defendants point to the pink, waxy substance—lipstick, according to defendants—on one of the condoms to bolster their claim of consensual oral sex. The trial court rejected this argument, finding defendants were not prejudiced by the inability to test for amylase. This conclusion is supported by substantial evidence.

The waxy substance was found on the condom containing DNA from Doe and Ellison; nothing connected that condom to defendants. At best, defendants posit that if they had sex with Doe before she had sex with Ellison, Doe's saliva on the condom would suggest consensual sex with Ellison, such that she must have also had the ability to consent to sex with them. Aside from the series of unsupported assumptions this theory requires—and the numerous accounts that put defendants as the last men in Doe's presence—it fails for one simple reason: saliva on a condom does not signify ability to consent, since oral sex can be forced on an unwilling victim. Indeed, Preston's counsel acknowledged the lack of probative value of amylase on the condom for this very reason.

Amylase on one of the condom wrappers might have had a modicum of probative value, as it might have indicated that Doe tore the condom wrapper open with her teeth, suggesting a willing sexual encounter. But unlike the waxy substance on the condom that tenuously suggested possible contact with Doe's mouth, there was no evidence suggesting amylase would be found on any condom wrappers.

### 4. Condoms in the Trunk of Doe's Car

Preston additionally claims he was prejudiced by the destruction of the condoms found in Doe's car. As described in greater detail in Part 3 of this opinion, when Doe's car was located after the assault, there were condoms in the trunk whose wrappers were "strikingly similar" to the wrappers found in the kitchen garbage. Although initially retained as evidence, they were destroyed by the Antioch Police Department in 2005. Preston submits that those condoms were "highly relevant to the defense" because if the condoms containing defendants' DNA were the same as those in Doe's car, one could

33

infer that Doe supplied the condoms and thus willingly engaged in sex with defendants. The trial court properly rejected this argument, however, because even assuming evidence showed that condoms were identical, there was no evidence they were unique or that Doe brought condoms into the apartment. The inference Preston advocates was simply too tenuous to support a conclusion that defendants were prejudiced by the inability to determine if the condoms were the same.

### 5. Loss of Opportunity to Serve Concurrent Time

Lastly, Bickham argued below that he was prejudiced by the lost opportunities for concurrent sentencing, since he had served jail terms on three unrelated cases in 2005 and 2007. He does not appear to repeat this argument on appeal. Wisely so, since, as the trial court correctly noted, the lost opportunity to serve concurrent time, standing alone, cannot support dismissal for preaccusation delay. In other words, a finding of prejudicial delay cannot be grounded solely in a lost opportunity for concurrent sentences. (*People v. Lowe* (2007) 40 Cal.4th 937, 942–946.) Only after defendant makes a showing of additional causes of prejudice may the trial court then "consider the defendant's loss of an opportunity to serve a concurrent sentence in weighing all of the prejudice to the defendant against the prosecution's justification for the delay." (*Id*. at p. 946.) Here, the trial court found no showing of other forms of prejudice—a finding supported by substantial evidence. The court therefore properly rejected this argument.

### 2. The Trial Court Did Not Commit Instructional Error Regarding the Burden of Proof on the Question of Doe's Consent

In his second argument, Bickham contends that the trial court committed prejudicial error by failing to instruct the jury on the burden of proof it should apply in deciding whether Doe had legally consented. There was no instructional error.

Concerning the elements of the offense of rape of an intoxicated woman, the trial court instructed the jury as provided by CALCRIM No. 1002, as follows:

"To prove that a defendant is guilty of this crime, the People must prove that, one, the defendant had sexual intercourse with a woman; he and the woman were not married to each other at the time of the intercourse; the effect of an intoxicating substance

34

prevented the woman from resisting; and the defendant knew or reasonably should have known that the effect of an intoxicating substance prevented the woman from resisting. [¶] . . . [¶]

"A person is prevented from resisting if he or she is so intoxicated that he or she cannot give legal consent.

"In order to give legal consent, a person must be able to exercise reasonable judgment. In other words, the person must be able to understand and weigh the physical nature of the act, its moral character, and probable consequences.

"Legal consent is consent given freely and voluntarily by someone who knows the nature of the act involved.

"A defendant is not guilty of this crime if he actually and reasonably believed that the woman was capable of consenting to sexual intercourse even if that belief was wrong.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman was capable of consenting. If the people have not met this burden, you must find the defendant not guilty."

The trial court also instructed the jury on the prosecution's burden of proof, as taken from CALCRIM No. 220:

"The defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove the defendant guilty beyond a reasonable doubt. Whenever I tell you the People have to prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise.

"Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

"In deciding the case whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial.

"Unless the evidence proves the defendant is guilty beyond a reasonable doubt, they are entitled to an acquittal and you must find them not guilty."

The jury was also instructed, pursuant to CALCRIM No. 359, that it "may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

These instructions informed the jury that it could return a guilty verdict only if it found beyond a reasonable doubt that defendants knew, or reasonably should have known, that Doe was incapable of consenting due to intoxication. And the jury was informed that the burden of establishing the lack of consent by Doe or the lack of actual and reasonable belief of consent by defendants fell on the prosecution and that the prosecution was obligated to prove these elements beyond a reasonable doubt. These were proper, complete instructions.

Despite this, Bickham contends that the instructions were inadequate because there is a "general rule" that a defendant need only establish the existence of facts creating a defense by raising a reasonable doubt as to their existence or nonexistence. And, he submits, the jury here should have been so instructed. This argument fails for multiple reasons. First, that is the essence of what the court instructed the jury. By instructing that the prosecution bore the burden of proving beyond a reasonable doubt that defendants knew or reasonably should have known that Doe was prevented from consenting by the effect of an intoxicating substance, the converse was necessarily true: defendants could defeat the prosecutor's burden on the element of consent by creating a reasonable doubt that they lacked an actual or reasonable belief of Doe's capacity to consent, in other words that they reasonably believed Doe had the capacity to consent. This is precisely what Bickham claims the court should have instructed the jury.

Second, the actual belief or reasonable belief in Doe's capacity to consent was not an affirmative defense, as Bickham claims, but rather an element on which the prosecution bore an affirmative burden. (See *People v. Ramirez* (2006) 143 Cal.App.4th 1512 [rejecting defendant's request for a mistake of fact instruction because it was logically inconsistent with prosecution's burden of proving that defendant knew or

36

should have known that the effect of an intoxicating substance prevented the victim from resisting defendant's acts of kidnapping and rape].) Bickham cites a series of cases in claimed support of his position, but those cases involved situations in which the defendant sought to prevail on a defense to the charge against him, which was not the case here. (See, e.g., *People v. Sherow* (2011) 196 Cal.App.4th 1296, 1304–1305 [lack of consent to enter a building is not an element of burglary but is instead a defense on which the defendant bore the burden of raising a reasonable doubt as to the facts underlying the defense]; *People v. Costello* (1943) 21 Cal.2d 760, 765 [defendant must be acquitted if he introduces evidence sufficient to create a reasonable doubt in the minds of the jury as to an alibi defense]; *People v. Graham* (1976) 57 Cal.App.3d 238, 240 [rather than showing duress by a preponderance of the evidence as the jury was instructed, defendant only had to raise a reasonable doubt he had acted in the exercise of his free will].)

Finally, even if we were to conclude the trial court committed instructional error, such error would have been harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24.) By placing the burden on the prosecution to prove beyond a reasonable doubt Doe's legal incapacity to consent and defendants' knowledge of this incapacity, the trial court gave instructions that were more favorable to the defense than those which Bickham argues should have been given. Were all that not enough, the evidence that defendants knew or reasonably should have known that Doe lacked the capacity to consent was overwhelming.

### 3. The Trial Court Did Not Violate Defendants' Rights to Due Process When It Excluded Evidence of Condoms Found in Doe's Car

Lastly, Preston contends that the court violated his right to due process by excluding evidence of condoms found in the trunk of Doe's car when it was located after the assault. Although initially retained in evidence, they were destroyed in 2005. As Preston describes his argument: "[T]he key issue was whether Doe was too intoxicated to consent when she had intercourse with Preston. Evidence that she supplied the condom he used would allow the jury to reasonably infer that she understood what she

37

was doing, which directly supports the claim that she had the capacity to consent, and in fact did consent."

Over objection by counsel for Preston, the prosecutor sought to exclude all evidence of the condoms found in Doe's car. He reasoned that they would have no probative value aside from the prohibited use of showing that Doe was inclined to engage in sex because she kept condoms in her car. Further, there was no evidence that Doe brought the condoms into the apartment that evening. Counsel for Preston, on the other hand, argued that the condoms (which were found in a bag also containing lubricating gel and a bar of soap) might suggest that Doe intended to engage in sexual intercourse with defendants all along and that she was not too intoxicated to consent.

The court expressed its initial inclination to exclude the evidence because it had minimal probative value and was unfairly prejudicial, noting that the condoms might be of greater relevance if there was some evidence that uniquely identified those condoms as the same condoms found in the apartment. Argument ensued, after which the court again indicated that based on what it knew at that point, it would likely exclude the evidence, noting that condoms are far too fungible and commonplace to suggest a handoff from Doe to defendants. On the court's suggestion that testimony from the officer who recovered the condoms from both the apartment and Doe's car might be necessary to resolve the issue, retired Antioch police officer Michael Schneider was called to testify.

Officer Schneider testified that in his report, he had described the wrappers in the kitchen garbage can as "identical" to the one found in the bedroom dresser in the apartment. He had described the condom wrappers in the trunk as "strikingly similar" to those found in the kitchen garbage. He was unable to state that they were identical, however, because when he recovered the condoms from the trunk, he did not have the wrappers from the garbage in front of him. He recalled that the condoms in the car and those in the apartment were the same brand and the wrappers were the same color.

After hearing Officer Schneider's testimony and further argument from counsel, the court excluded all evidence of the condoms recovered from Doe's car, with the following explanation:

38

"THE COURT: [H]ere's the thing. I have said probably several—if not a half a dozen times, that there is this gap, in my view, in the connection between possessing condoms and the relevance of condoms to the issue of consent. . . .

"At this point, I'm ruling this evidence is inadmissible. In the event that the trial evidence changes, say, for example, because of testimony of a particular witness, for example, one of the defendants, I would revisit that ruling. But I simply do not find a connection, sufficient to overcome the highly prejudicial nature of the evidence to permit its being admitted at trial.

"I mean, the leap that I'm being asked to make, is that from the fact that the alleged victim had condoms, without any evidence of this or proffer of this, that she gave condoms to one or more defendants and in so doing, communicated her desire to have sex with them, therefore, have it be consensual. I mean, it is a leap that I just don't think is warranted by any proffer I've been given. [¶] . . . [¶]

"COUNSEL FOR PRESTON: Is your ruling based upon [Evidence Code section] 352 or is it based on [Evidence Code section] 782?[11] Obviously, we haven't—

"THE COURT: Well, I mean, you haven't filed a 782 motion, so if it's a 782, you'd be out anyway. In terms of 352, I am making a 352 [determination], based on my review of what's been presented to me. The evidence is highly prejudicial and it's probative value, in my view, is minimal. That could change, and if it does I'll be glad to reevaluate. . . ."

Evidence Code section 352 allows a trial court, in its discretion, to exclude evidence if its probative value is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice. Prejudice in this context means " 'prejudging' a person or cause on the basis of extraneous factors." (*People v. Farmer* (1989) 47 Cal.3d 888, 912; see also *People v. Smith* (2005) 35 Cal.4th 334, 357 [prejudicial evidence within the meaning of Evidence Code section 352 is that which

---

[11] Evidence Code section 782 establishes procedures governing the use of evidence of a victim's sexual conduct to attack the victim's credibility.

" ' "uniquely tends to evoke an emotional bias" ' " and " ' "which has very little effect on the issues" ' " (italics omitted)].) "Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]." (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) "[T]he balancing process mandated by section 352 requires 'consideration of the relationship between the evidence and the relevant inferences to be drawn from it, whether the evidence is relevant to the main or only a collateral issue, and the necessity of the evidence to the proponent's case as well as the reasons recited in section 352 for exclusion.' " (*People v. Wright* (1985) 39 Cal.3d 576, 585.)

A trial court has wide discretion in determining the admissibility of evidence, including whether to exclude it under Evidence Code section 352. (*People v. Mobley* (1999) 72 Cal.App.4th 761, 792–793.) We review the trial court's evidentiary rulings for an abuse of discretion. (*People v. Benavides* (2005) 35 Cal.4th 69, 90.) A trial court abuses its discretion if its decision is "palpably arbitrary, capricious and patently absurd." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.) Put another way, we will only reverse a trial court's section ruling excluding evidence under section 352 where "the probative value of the offered evidence . . . clearly outweigh[s] the prejudice it might cause." (*Brainard v. Cotner* (1976) 59 Cal.App.3d 790, 795.) Against this standard, we conclude there was no abuse of discretion here.

Turning first to the probative value of the condoms found in Doe's car, we agree with the trial court's assessment. Preston urges that the condoms support an inference that Doe consented to sexual intercourse with defendants because they were "strikingly similar" to the wrappers in the kitchen garbage can. The conclusion that Doe had the capacity to consent to sexual intercourse—the key issue in the trial—simply because she had similar condoms in her car is tenuous at best and requires multiple assumptions not supported by the record. As the trial court stated, "[Y]ou are asking me to make the inference that because the complaining witness talked with the defendant about having sex with her boyfriend, that I should interpret that to be an invitation to them to have sex with her. And a further gap, I should find she gave them the condoms to have sex with

40

her. That's a leap I'm not going to make based on what I've been told. There's nothing before me that would support such an inference." And the inference is made even more tenuous by the fact that condoms identical to those used during the assault were found in the apartment. Absent any evidence linking the condoms in the car to the condom Preston used—e.g., that the condoms in the car and the apartment were unique, that Doe brought condoms into the apartment with her, that Doe gave Preston a condom—the probative value of the condoms was virtually nonexistent.

At the same time, the risk of prejudice of allowing evidence of the condoms was significant. The fact that Doe kept condoms in her car may have caused jurors to harbor a negative bias against her based on perceptions of her sexual activity or promiscuity. As the prosecutor put it, "It makes her look dirty." In light of this, we conclude it was not arbitrary or capricious for the trial court to have excluded evidence of the condoms in Doe's car. Thus, there was no abuse of discretion.

## DISPOSITION

The judgments of conviction are affirmed.

_____
Richman, Acting P.J.

We concur:

_____
Stewart, J.

_____
Miller, J.